R. W. Williams, Appellant, vs. W. D. Moseley for the use of P. Smith, Appellee.

ROBERT W. WILLIAMS, APPELLANT, vs. WILLIAM D. MOSELEY, FOR THE USE OF PATRICK SMITH, APPELLEE.

H. as principal, and W. and C. as sureties, executed notes payable to B., as guardian of the heirs of F., upon the purchase by H. of lands belonging to the wards. B. the guardian died, and H. was appointed his successor, who, upon a settlement as guardian with the executor of B., his predecessor, received among other things the notes executed by himself, and gave receipts as guardian to the executor of B., as for so much money. H. afterwards, at the instance of C., one of his sureties, cut the names of W. and C. from the notes. In his accounts filed in the County Court, H. charged himself with a large sum, comprising nearly all the estate of his wards received from the executor of B., as received in " notes and accounts." H. died, and S., who was appointed his successor as guardian, instituted suit in the name of the executor of B., for his (S.'s) use as guardian, against W., one of the securities on the notes. Held, by a divided Court:

That the notes were not extinguished, and that S. was entitled to recover the amount of the notes.

A note payable in " current Florida money," is payable in good funds.

APPEAL from judgment rendered in Leon Circuit Court in favor of appellee, for $4,122 24-100, on 23d May, 1846.

This cause was argued at the last term, and also a second time at this term, when the judgment of the Court below was affirmed by a divided Court. The facts of the case fully appear in the opinions delivered by the Justices.

*D. S. Walker*, for Appellant :

The first question presented by this record, is whether the notes sued on were the property of Arthur Burney at the time of his death, as alleged in the first instruction asked for. That they were would seem to be admitted by the institution of this suit in the name of his executor Moseley. But as this proposition is in some sort denied by the Court below in refusing to give said instruction, and in giving the first it gave in its stead, we present the following authorities to sustain it: Chitty on Bills, 160, and cases cited— Same, 358. Story on Promissory Notes, page 130, sec. 125—page 461, sec. 375—page 132, sec. 126—page 296, sec. 250—page 129, sec. 123. Baily on Bills, 335, and notes—same, 76. 1 Vermont, 500.

The error of the Court is, in declaring the notes themselves to be the *trust* property of Arthur Burney, in contradistinction, as we sup-

pose, to the legal property, must have been fallen into by confounding the *paper and ink* used in making the notes, with the money intended to be secured by them.   That the *money*, had it been collected by Burney, would have been holden by him in *trust* for his wards is true, but the notes themselves were not his trust property. See Story on Promissory Notes, 122, sec. 126.

2. It being true, then, that the legal title to these notes was in Burney at the time of his death, it follows that that title passed to Moseley as his executor.   Therefore the next question is, whether Moseley was not divested of that title by voluntarily delivering them to Hart, the principal obligor, in consideration of his receipts for so much money.   These receipts were valuable to Moseley, because they were vouchers sufficient to discharge the estate of his testator, Burney, from the debt it owed to Farmer's heirs. Story on Promissory Notes, 540, 503, 504.

The receipts Hart gave are " binding" upon the heirs of Farmer, so as to preclude them from ever setting up this claim against Burney's estate.   See Thompson's Digest, page 201.   If, then, with these notes Moseley has paid off and discharged a debt that was valid and subsisting to their full amount against the estate of Burney, how can it be pretended that he still has title to them ?   If, then, Moseley has no legal title, this suit cannot be maintained in his name ; and if his right of action was even suspended, he cannot resume it now.   2 J. R., 471.   5 Peters S. C. U. S., 267.

3. But it is further contended that these notes were cancelled by being delivered to Hart, and by the names of Williams and Chaires being cut therefrom ; and that even if such cancellation has been fraudulent, (which is by no means admitted,) a suit *at law* cannot be maintained upon them.   A cancelled note is no note at all ; but if the cancellation is procured by *fraud*, a Court of *Equity* may relieve against such fraud, by compelling the obligors to pay the money just as if the note had not been cancelled.   This power does not appertain to a court of law ; our statute in regard to the ·mode of suing at law upon lost notes makes no provision for a suit at law upon cancelled notes.  It is obvious that this cancellation took place with the approbation of Moseley, who had been the legal owner, and Hart the principal obligor, to whom they had been delivered as aforesaid.   If this was a fraud, it cannot be relieved against in a Court of law, but relief can only be had in a Court of Equity.   See

39

Daniel's Chancery Practice, 504, 505, in new law library, 298, and cases there cited.

4. But the main question in this cause still remains to be discussed; for it is obvious that if it shall be dismissed merely because a wrong party is suing, or the suit is instituted in the wrong court, the ultimate liability of Williams will not be thereby determined. That question is, whether Williams is liable to any person, in any court, upon these notes. We contend that when Hart, the principal obligor in these notes, became possessed of them as the guardian of the heirs of Farmer, such possession operated in law as an *extinguishment* of all liability of Williams upon said notes. This, we think, is made manifest by the following authorities: In 5th Peters Rep. of S. C. U. S., 207, the court say—" The executor cannot sue himself, and for this reason he is authorized to retain his debt out of the assets in his hands. The right of action being once extinguished, cannot be revived, either by the executor or his legal representative. On this point, the authorities are decisive; and although some difference of opinion seems to have been entertained as to the extinguishment of the debt, yet it is in effect extinguished, as the legal right to enforce the payment of it is gone."

In the case of Hall *vs.* Hall, 2 McCord Chancery Reports, 304, the Court say—that " debts due from the executor to the testator, are so much cash in the hands of the executor."

In the case of O'Neal *vs.* Herbert, 1 Dudley's Law and Equity Reports, 31, Chancellor Harper, in delivering the opinion of the Court, says—" I suppose that if an administrator have in his hands the balance of an estate, and is afterwards appointed the guardian of infants entitled to it, he will be chargeable as guardian, and will be liable as in the case of Simkins *vs.* Cobb, (2 Bailey Reports, 60.) So, if before his appointment he has received a sum of money belonging to his wards, as in McDowel *vs.* Caldwell, (2 McCord's Chancery Reports, 55.) *Or, if in any other capacity he be indebted to himself as guardian, being unable to sue himself, the debt* shall be presumed to be paid."

In Chief Justice Marshall's Decisions, 267, is the following case: The testator Munford by his will gave a bond on John Bannister to his daughter Francis, and made his brother Robert her testamentary guardian, and his own executor. Robert charged himself as executor with the amount of the bond, and assumed the same to be his undeniable property. Chief Justice Marshall held, that Robert as

executor, with his securities, was not bound ; but that Robert was bound as guardian, on the ground that when he chose to consider the bond as money in his hands, (which he had the right to do,) he was instantly chargeable with it as guardian, because it being his duty instantly to pay it over to himself as guardian, the law will consider him as having done that which he ought to have done. Now, we argue that if Hart had the right to consider the bond of " John Bannister" or any one else as cash, and to charge himself with the amount thereof, and assume that it was due to himself individually, surely he had the right to consider the notes of himself and Williams as cash, and to charge himself with the amount thereof.

In the case of Galphin *vs.* McKinney and Breithaupt, (1 McCord, 280,) Brooks as commissioner in equity was ordered to sell land. He did so, and McKinney purchased it and gave his bond with Breithaupt as his security for the purchase money. The money, when collected, was to go to McKinney as the executor of Galphin. McKinney applied to the Court to have this bond delivered up to him, and it was done. The Court of Appeals of South Carolina decreed that it was properly delivered up to him, and that Breithaupt the security would have had the right to have it delivered up to be cancelled if McKinney had not done so. To change the names of the parties, Arthur Burney was made a commissioner to sell lands. He did so, and Hart became the purchaser, and gave his notes with Williams as his security for the purchase money. The money when collected was to go to Hart as guardian of the heirs of Farmer. Therefore Hart had the right to have those notes delivered up to him to be cancelled, and Williams himself would have had that right if Hart had not exercised it.

In the case of Gray *vs.* Brown, 1 Richardson's Law R., 352.— William G. Steel was trustee for Rachael Carrol, who married and died leaving five children, of all of whom B. R. Carroll was appointed guardian, and defendant Brown signed his guardianship bond as security. Afterwards Carroll, the guardian, was substituted trustee in place of Steel, and on 9th June, 1833, filed a petition for leave to sell the trust property. This leave was granted (see it page 353) on his giving bond with security in double the value of the property, the bond was given (see it on page 353.) The property was then sold, and Carroll received the money for it, being $3200. Carroll did not account for the money, which he thus received as trustee and became insolvent. This suit was brought to recover the amount

from defendant Brown as security on Carroll's guardianship bond. The Court of Appeals held that Brown was bound to pay it, because it was Carroll's duty, as trustee, to pay himself as guardian, and the law presumes he did so. The Court further declared that " even entire destitution of means would not seem to arrest the presumption of payment, which by law results from the union of debtor and creditor." The Court says further, " The cases which have been cited from our Court—Simpkins *vs.* Cobb, 2 Bail., 60. McDowel *vs.* Caldwell, 2 McCord, Ch. 55. Hall *vs.* Hall, 2 McCord, Ch. 304. Joyner *vs.* Cooper, 2 Bail., 199. Schnell *vs.* Schroder, Bail. Eq., 334, and O'Neal *vs.* Herbert, McMull. Eq., 334, *all* seem to regard the extinguishment of the debt as a necessary legal result of this union, 304.

*Mr. Thompson* for Appellee contends :

I. As to the first error assigned, that Tom Peter Chaires was properly excluded. He was one of the makers, a co-surety with Williams, and liable for contribution, in case of recovery against Williams. He was not competent without a release. 1 Greenleaf on Ev., sec. 390, et seq., 402—Leroy *vs.* Johnson, 2 Peters S. C. Rep., 187, 194—Bagley *vs.* Osborne, 2 Wendell R., 527—Ransom *vs.* Keys, 9 Cowen R., 128—Carleton *vs.* Whitcher, 5 N. Hamp. R., 196—2 Philips on Ev., 1521, and notes, where all the cases are reviewed, and the ruling of the Court sustained.

II. As to the second error assigned, the refusal of the Court to permit the witness Lang to give evidence of the declaration of defendant himself in his favor.

The Court below did not err in this—the defendant sought to give evidence of what he had himself said to the witness, a third party, in relation to these notes, and thus make evidence for himself.

The conversation, too, was at a time subsequent to the institution of the suit.

I do not conceive it necessary to say more on this point.

III. The Court did not err in its refusal to instruct the jury, as prayed by the defendant.

1. The first instruction asked for seemed to regard Burney as the owner of the notes, having full property in them : this was in direct opposition to the evidence, which showed that he held them in

his fiduciary capacity as guardian. The first instruction which the Court gave states the law correctly according to the facts of the case.

2. The second instruction asked for was, that the delivery, without fraud, by Moseley to Hart of the notes in suit, in consideration of the receipts, operated as a divestiture of all title out of Moseley, and therefore this suit cannot be maintained in his name.

The delivery was made to Hart, in virtue of his letters of guardianship—Moseley being the representative of Burney, the former guardian. If the party here meant that the delivery, without fraud, to Hart extinguished the notes, that will be considered in the argument on the 3d, 4th, and 5th instructions hereafter.

If, however, he meant that the notes being assigned by Moseley by delivery operated as such a divestiture of interest and title as would prevent his name being used by a holder to recover the money, it is clearly erroneous, and the Court below was right in its refusal.

The notes were payable to Burney, guardian, &c.—they did not contain the words, " or order, or bearer"—the assignee or beneficial owner has a right to use the name of the payee for the purpose of recovery. Eastman vs. Wright, 6 Pick., 322. Payne vs. Rogers, Doug., 407. Locke vs. Taunton, 7 Taunton, 9. Skinner vs. Sims, 14 Mass. R., 107. Mosher vs. Allen, 16 Mass., 452. Winchester vs. Hackley, 2 Cranch, 342. Jarman vs. Howard, 3 Marsh, 384. Smock vs. Taylor, Coxe, 177.

The death of the assignor does not defeat the assignment, but the assignee may use the name of the executor or administrator of the assignor to recover the money. Dawes vs. Bowleston, 9 Mass, 337. Cutts vs. Perkins, 12 Mass., 206.

The action, therefore, is well brought in the name of Moseley, administrator, for use, &c.

3. The 3d, 4th, and 5th instructions are the same in substance, and assert the position that Hart, being one of the makers, and acquiring the possession without force or fraud, the notes were extinguished.

It is said that when the right to receive and the duty to pay unite in the same person, the debt is extinguished, but there are exceptions to this rule.

When the right to receive is in *auter droit.* 8 Co. Reps., 136, Nedham's case. 1 Salk., 326, Gray vs. Acton.

R. W. Williams, Appellant, *vs.* W. D. Moseley for the use of P. Smith, Appellee.

It does not extend to administrators. 4 Bac. Abr., 15, Tit Ex's. 6 Iredell Law Rep., 448.

Nor to guardians: in which case right of suit is not even suspended. Winborn *vs.* Gorrell, 4 Iredell Eq., 117, 121.

Nor to the case where a woman residuary legatee married the sole executor; her share of the residue being held to survive to her. Baker *vs.* Hall, 12 Vesey, 497. Gray *vs.* Acton, 1 Salk., 326.

Administrator bound to inventory notes, though he is the promissor, and though he denies they are due. Porter *vs.* Titcomb, 1 Fairfield R., 53. See also, 2 Rich. Rep., 80, Bellume *vs.* Wallace.— And Kent *vs.* Somerville, 7 Gill & Johns, 265.

4. The 6th instruction asked and refused was, that if Hart obtained possession of these notes lawfully he had a *perfect* right to destroy the same, &c.

He received the notes in his capacity of Guardian, and in virtue of his authority under the letters, &c.

He had no authority as holder to destroy the interests of the real owner. Hill *vs.* Calbert, 1 Rich. Eq. R., 56.

A Guardian is an agent, having an authority not coupled with an interest. Granby *vs.* Amherst, 7 Mass. R., 6. Manson *vs.* Felton, 13 Pick., 209. 4 Scammon 127, 133.

They are not invested with anything like the same authority that belong to Executors. Per Hitchcock, C. J., in Swoope *vs.* Trotter, 4 Porter, 36. See also, Exum *vs.* Bowden, 4 Iredell, 281.

The value of the interest which a Guardian has in the ward's estate, is not the value of the estate, but the office of Guardian so far as compensation for labor and services extend. Ritchie *vs.* Mauro & Forrest, 2 Peters, 243.

He cannot release a debt, though to make the debtor a witness for the ward. Fraser *vs.* Marsh, 3 Cond. Eng. C. L. Rep., 235.

So his admissions are not evidence against the ward. 3 Cond. Eng. C. L. Rep., 385.

He cannot bind the person or estate of the ward. 6 Mass. R., 58. 1 Pick. R., 314.

Nor do any act to prejudice his ward. Jackson *vs.* Sears, 10 John. R., 441.

Considered as *agent* of the wards in the collection of these demands, he could only discharge the debtor of his principal by the receipt of the money due. He cannot receive a discharge of a debt

due from himself to the debtor, and thus make himself debtor to the principal. Story on Agency, p. 170, sect. 181. Ibid, 439, sect. 430. Paley on Agency, 262.

A factor has authority to sell for money, not to barter: if he barters no property passes. Guereiro vs. Peile, 3 Barn. & Ald., 616.

He may not pawn or pledge the goods, and if he does the property in them is not altered. Patterson vs. Tash, 2 Strange, 1178.— Newsom vs. Thornton, 6 East., 17. Shepley vs. Kymer, 1 M. & S., 484. Everitt & Saltus, 15 Wend., 275. Ibid, 20 Wend., 268.

So also, a party receiving bills to be applied to a specific purpose cannot by applying them to his own use alter that purpose and make the trust a debt. 2 Smith's Leading Cases, 89, 131. See also Woodson vs. Payne, 1 Call, 570.

All the parties to the notes had notice of the trust, or real ownership. The notes not being payable to Burney, as "Guardian of the heirs of John Farmer, deceased,"—it was notice. Exum & Bowden, 4 Iredell Eq. R., 281. Powell vs. Jones, 1 Iredell, 337. Fox vs. Alexander, Ibid, 340. Lockhart vs. Phillips, Ibid, 342.

Considered as a *Trustee*, he could not alien the trust fund in payment of his own debt. Graff vs. Castleman, 5 Rand., 195.

Nor alter the destination of the fund from the purpose for which it was originally intended. Presbyt. Church vs. Dounom, 4 Dessau, 154. Hill vs. Simson, 7 Vesey, Jr., 152. Dodson vs. Simpson, 2 Rand., 294. Rutledge vs. Smith, 1 McCord. Ch'y, 119.

5. The Court did not err in refusing the 7th instruction asked for by the defendant below.

A receipt is not conclusive evidence: it may be explained or rebutted by parol. 1 Phillips on Ev., 108. Elwell vs. Leslie, 2 Halstead, 349.

But these receipts are by Hart, one of the payers of the notes, and to give to the receipts the effect contended for is to permit a party to make the evidence of his discharge.

6. The 8th instruction asked for, was on the supposition that the Court would charge that the legal title of the notes did not pass to Burney's representative on his death, but the Court did charge that Moseley, the representative of Burney, held the notes as Burney had held them in his life time.

7. The 9th instruction asked for, was an abstract question of law

R. W. Williams, Appellant, vs. W. D. Moseley for the use of P. Smith, Appellee.

which though right the Court may well refuse.   Caton vs. Lenox, 5 Rand., 31.   Hamilton vs. Russell, 1 Cranch., 309.

8. The Court was right in its refusal to give the tenth instruction. " Current Florida money," means specie, or par money.   See Cockrill vs. Kilpatrick, 9 Missouri R., 697.

9. The Court was right in refusing the 11th instruction asked for. The character in which Moseley sues was not denied by plea, which is necessary if defendant would put it in issue.   1 Chitty Pl., 526. Thyme vs. Thyme, 2 M. & S., 553.   Worshem vs. Goar, 4 Porter, 441.   Champlain vs. Tilley, 3 Day, 303.   Pollard vs. Butler, 3 Blackf. 239.   Coxe vs. Roberston, 1 Bibb., 604.   McKim. vs. Riddle, 2 Dallas, 100.

IV. The fourth error assigned is that the Court erred in the instructions given.

1. That the first is correct is manifest from the facts which appeared in evidence.

2. The Court was right in leaving the fact of payment to the jury. See Garlock vs. Geortner, 7 Wend., 198.

3. The third instruction is fully sustained by the argument and authorities in justification of the refusal of the prayer of the defendant.

An action at law may be sustained on the notes, though mutilated by the cutting off the names of T. P. Chaires and R. W. Williams, the same having been done by Hart in fraud of his wards the beneficial owners of the notes.   See U. States vs. Spalding, 2 Mason Rep., 478.

It was a fraud in Hart, and none can gain any interest thereby. 4 Iredell Eq., 219.

V. As to the fifth error assigned, that of the trial on the 23d May, 1846, there is nothing in it.

A Court may be continued to a distant day by adjournment.   See Mech. Bank vs. Withers, 6 Wheaton, 106:

See also 7 Barn. & Cres., 6—the case of the King vs. Leicester, in which it was held that the 54 Geo. III. c. 84 which enacted that the Michaelmas Quarter Sessions shall be holden in the week next after the 11th of October is merely directory, and the sessions may notwithstanding that enactment, be legally holden at another time.

*Archer* on the same side.

R. W. Williams, Appellant, *vs.* W. D. Moseley, for the use of P. Smith, Appellee.

*Brockenbrough* for Appellant, in reply:

I. In this action we must consider the rights of *Moseley, executor,* alone, and if he, in that character, cannot recover, no recovery can be had—the *appendage* of the words, "for the use of Patrick Smith, guardian of the heirs of John Farmer," in no respect alters the rights, claims, or character of the plaintiff—with them the defendant has nothing to do. He can traverse nothing and take no issue, with or about Smith; the words only regulate rights between Moseley and Smith, and cannot increase Moseley's rights against defendant.

By suing in this mode, Smith admits he has no right of action *in his own name, in this case,* and if Moseley has none, they cannot recover together, when neither could separately. Even if Smith could separately, it will not avail him *here,* unless Moseley, Admr. can, because *he* sues.

Mr. Thompson's doctrines in his printed brief, "that the assignee or *beneficial owner* has a right to use the name of the payee, for the purpose of recovery, and that the death of the assignor will not defeat it, and even that the assignor cannot dismiss, &c.," *is not denied.* But *the application* is denied—

1. Because the doctrine and authorities apply only to releases, discharges and equities, between assignor and defendants, *arising subsequent to assignment,* or notice thereof. And here all our defences *vs.* Moseley existed long *anterior* to any possible interest in P. Smith.

2. P. Smith never had any assignment whatever from any one.

3. Smith is not the " *beneficial owner*" of these notes if existing— but his *several wards*—who have several interests, and several rights —and must proceed *severally* in any action that they bring *at law.* —Burnet *vs.* Commonwealth. 4 J. J. Marshal, 389. 7 Pick. 88.

4. If the notes existed, and the law assigned them to Smith, the law made the same assignment before to Hart; and if so, the *legal* title has never been in Moseley, and he cannot now sue. If the words "guardian" imply a severance of the funds from Burney's own funds, as " administrator" is held to do—and upon the authorities cited—it would then have to be admitted that there can be a *guardian* in the nature of a *guardian de bonis non,* to whom the notes would go, as to an administrator de bonis non, in the case supposed. It then follows that the 2d or 3d guardian, (*de bonis non !*) must have the legal title, and sue in his own name, (for by this doctrine Moseley never could sue, as no estate would come to him.)

40

R. W. Williams, Appellant, *vs*. W. D. Moseley for the use of P. Smith, Appellee.

Admistrators de bonis non do not sue in the name of the executor of the first administrator.

This doctrine is inconsistent with the doctrine of assignment from Moseley, and with this suit. If on Burney's death the paper goes to Hart, and thence to Smith, as the ward's estate, nothing goes to Moseley.

II. The question then is not, what could the heirs of Farmer do? or what could Patrick Smith do? As they are not parties to the record, and the *heirs* certainly no more bound by the acts of Smith than by those of Burney or Hart—and Moseley and Smith combined can do no more than Moseley and Hart combined. The question is, can *Moseley* recover?

1. *The legal title passed to Moseley—or it did not.*

1. If Moseley can sue now, some legal right must have passed to him on Burney's death. *There is no intermediate state—a man must have the legal* right entirely, *or not at all*. In Mr. Thompson's cases, the words "Administrator &c.," passed over the whole estate to Administrator de bonis non, and left none in Executor of first Administrator. So on Mr. Archer's supposition, that title passes to successive guardians by act of law in virtue of their appointment.— The whole *title passes*, if he is correct, or none at all—and unfortunately for Moseley's title to sue, the whole title would pass, not to the guardians, but still further off *to the wards*, for the *land was theirs* —as in the cases he supposes, of bond to the Governor and his successors. He says no title could pass to his Executor or Administrator—conceded. But then Moseley cannot sue. See case cited by Mr. Thompson, 8 Eng. C. L., 45, Catherwood *vs*. Chabaud. The administrator de bonis non took the *title*, and sued in his own name. See also 1 Salkeld, 306. *The title passed directly.*

2. If this action is sustainable, then Moseley must have taken the whole legal right in these notes when Burney died. If a right to sue existed, he then had a right to receive payment on them, and charging his account as Executor with the money, to credit the Testator's guardian's account. This was the only thing he could honestly do with the money when he received it. This he did.— When Hart was appointed guardian, Moseley renders *an account*, crediting Hart as guardian, and debeting himself as Executor.— Hart's receipt paid the debt due from him to the guardian, and also the debt due from him as Executor—and being filed, releases him as Executor—releases Burney as guardian—and on his bond to sell

land. It also charges Hart and his sureties with *cash as guardian*. All these things he had a right to do, and it was his duty to do. The payment of notes over to Hart, and his receipt might have left open for a long term of years, dangerous question of liability of his Tes tator and himself. He closed all questions. He made his election. The law was with him. Alston *vs*. Mumford, 1 Brockenbrough, 278, and note and cases cited, viz : Taylor *vs*. Deblois, 4 Mason, 131. Pratt, &c. *vs*. Northan, &c., 5 Mason, 108. Myers *vs*. Wade, 6 Rand., 444. To which cases special attention is invited.

These things we contend Moseley had a right to do—if he had not, he is *estopped* from disputing his right *vs*. Hart—a *fortiori vs*. Williams. See Lord Denman's beautiful rule as to estoppels *in pais* in the case of Pickard and Sears. 6 Adolphus and Ellis, 475— cited and approved and adopted by this Court in Cotten *vs*. Williams, 1 Branch, 34. 5 Arkansas, 568. Cheever *vs*. Smith, 15 Jo., 276. Bacon *vs*. Chesney, 2 Eng. C. L., 352. Parsons *vs*. Administrators of Gaylord, 3 Johnson, 464. Coxe *vs*. Williams, 4 Cond. La. R., 249. "A positive right conferred by law on the doing of a certain act, cannot be destroyed by *speculations* as to what would have been the situation of parties, if that act had not been done." Nolte et al. *vs*. Their Creditors, 4 Cond. Lou'a. Reps., 136. 1 McCord, 298, Galpin *vs*. McKinney, et al., a great case upon the whole subject, the equity of which has not been and cannot be impeached.

This case, and Gray *vs*. Brown, 1 Richardson, 364, (and the many cases there cited,) and the principle of extinguishment in all fully sustained, are not in the least overruled, or even the doctrine approached in Bellune *vs*. Wallace, 2 Richardson, 81. In that case, there was no question of extinguishment whatever. The two guardians bonds were held to be entirely *cumulative*, and therefore the last bond did not discharge the first, and therefore the mortgage given to secure the surety in the first bond, was not discharged by giving the last. And the real question in the case was whether the mortgagee (his mortgage being thus held good,) could bring an action of trover for a slave against a purchaser under judgment against the mortgagor, before he, the surety, had actually paid money on account of his suretyship, and been therefore damnified. And it was held he might. Because the mortgage passed a present estate, and performance of the condition must be shown to defeat. There was no question of extinguishment. Wardlaw, dissenting, still con-

tends that the whole doctrine of extinguishment is in full force.—He dissents only on the main question—whether trover would lie, until the party had actually been damnified by payment.

He admits the continuance of the mortgage, by saying " the proceedings were probably such as saved to the plaintiff in his securityship to the second bond, all the securities he had taken when he signed the first bond." And he goes on to say, " BUT IF" the guardianship had been revoked and a new appointment made to the same man, he would have been held to have paid over the assets to himself under the new appointment, and in discharge of his first sureties, under the authority (which he cites) of Gray vs. Brown, and cases there cited as the admitted law. And which position, so far from being overruled or doubted, is not even alluded to by the Court in its decision.

The hypothetical citation of a well established principle, (in a case in which it is admitted it does not apply,) in a dissenting opinion, on a wholly different question, is cited to show that the Court, which does not allude to the subject, intends to overrule a whole series of well considered and established cases, which had been before cited and approved as the law by the same Court, in the same year, (1845)—the first being in January, the latter in December.—And when *Wardlaw, O'Neal, Butler,* and *Frost,* decided the first cause, and only Evans dissented. And *Evans, O'Neal, Butler,* and *Frost,* decided the last case, and Wardlaw and Richardson dissented on another point, citing the former case as established law. Can O'Neal, Butler and Frost, be held to have changed their minds, and overruled so many cases, so lately approved, without a *word upon the subject,* and in a case in which it is admitted the question did not arise ? No one could be more surprised than those Judges would be at the citation of the last decision as overruling the whole series preceding. Certainly Bellune vs. Wallace might as well be cited as overruling any other series of cases.

To return to Estoppels:

See also Doe-demise of R. V. vs. Oliver & Duchess of Kingston's case, 2 Smith's leading cases, 439 [30 Law Lib. 105.] Estoppels must be mutual. Hart and his sureties on his guardian bond, and Hart's adm'r would be estopped by Hart's receipt. Even his wards themselves would be estopped by it conclusively.—*Thompson's Digest,* 201, 36.

If the Farmers sued Moseley for these notes specifically, he might

R. W. Williams, Appellant, vs. W. D. Moseley for the use of P. Smith, Appellee.

reply that they were paid to him. And it must be a good reply, if he can sue on them. And if sued for the money, he can reply this receipt. The receipt being *conclusive* between him and the wards, *a fortiori* must it be conclusive between him and any subsequent guardian. And if conclusive *for* him, it must be *against him.*— Certainly *when suing in the same right.* Nor is it evidence made by Hart for himself, as Mr. T. contends. Moseley wrote it—dictated—exacted it. Moseley made out the account and rendered it— He accepted it—He filed it—He has relied upon it. It is the sheet-anchor of safety to himself and Burney's Estate.

4. The Record shows that Moseley is no longer held bound in the Probate Office—but Hart. There is a judgment there approving Hart's loose memorandum, so far as it charges himself. The account is "examined, approved, and allowed." This is *res judicata* —The decision of a Court of competent jurisdiction unreversed.— It discharges Moseley as Executor, Burney as guardian—and on his land-selling bond. It charges Hart as guardian, and discharges him and sureties as an individual.—See Steele guardian *vs.* Glass —1 Kelly, 488.

The recovery in this action by Moseley could not *undo* all this. If he recovers he holds as his own. He cannot by recovery make the discharged parties again responsible. By not paying over the money he would commit no devastavit. If insolvent, Williams would lose it.

III. The notes were *extinguished* before they came to *Hart's hands.* They never came to his hands *as guardian.* He and Moseley are both estopped from saying they did. When Moseley *calculated the interest then due,* and charged up principal and interest in an account rendered—he admitted them paid, and that he only then held them as a *voucher* for correctness of his entry, and when he consummated his act by taking the receipt, or one new voucher for the whole account, he had no longer a right to hold it in any shape. It then became Hart's voucher for the payment for land, and as we[c]k should have received it. Except as such he had no right to receive it.— Hart could not then attempt to set up the extinguished title in his own hands, without fraud.

1. Upon his own securities in the note, who had been discharged.

2. Upon his wards, for whom he had received so much cash, the principal and interest on which combined sum he and his bondmen

were liable for interest annually, until they came of age. Thompson's Digest, 207.

If the note had come to his hands and been thereby extinguished, he would have been responsible for the amount as guardian, as by his actual arrangement with Moseley; but if as opposing counsel contend, the right of action would have been suspended pending his guardianship, then by attempting to set up this note, when so passed to him by Moseley, he would have committed a further fraud upon his wards, by releasing his sureties on the guardian's bond, (made responsible by his receipt to Moseley)—*and if he could have validly set it up* against Chaires and Williams, he would be holding for a long term of years at *simple interest* his *own uncollected paper*, with all the hazards of death and insolvency in Chaires and Williams, and the certain *operation of the statute of limitations* in a short time, instead of being responsible for cash received on his bond and security as guardian, and compound interest annually, and immediate liability at all times to a call for new security, or to *disgorge.*— Thompson's Digest, 225, sec. 2.

For these reasons, Moseley and Hart's conduct was most beneficial to the wards. It was best calculated to secure their interests. It was such a course as any man would wish pursued in his own affairs. It was the most favorable arrangement which could be made.

Fields *vs.* Schieffelin, 7 Jo., Cha. 150, [powers and duties of guardians, and nature of their estate fully examined and decided upon.]

We have yet to hear of any disaster. No *devastavit* is shown. The money is yet in Hart's hands, and no evidence of even a call upon him, or his administrators or sureties. The receipt of the money by a guardian is no *devastavit.* It is the very thing he was appointed to do. It is only non-payment when required that shows impropriety. See Bryant, guardian, &c. *vs.* Owen and wife, 1 Kelly, 374—doctrine at large, and confirmed in a subsequent case same volume. The record does not show that they have not collected it. They may be suing now. They might yet sue, and recovery in *this action* would not be a bar, even when paid. When Hart received the note, it would have been a fraud to attempt to set it up. The only honest course was to cancel actually, that which was already legally discharged.

IV.—1. But Williams is only a surety. His obligations are *stric-*

*tissimi juris.* He had a right to pay the notes at the moment due, and sue Hart. Could *Moseley*, after the receipt, have accepted payment ? And if he had, could Williams, on Moseley's receipt, have recovered from Hart, who had already discharged the note by irrevocably rendering himself responsible as guardian to his wards ? If so, Moseley could, by his acts, lawfully put Hart, without his consent, in a situation to be forced by law to pay the same debt twice.

2. Moseley then calculated all the interest then due, and charged himself with it, and was discharged by Hart. Can he now, after Hart's death, make Hart's surety pay him, not only that interest, but all that has since run upon the note, if unextinguished ?

3. Hart is dead. If Williams pays, his remedy is against Hart's administrator. But his administrator is strictly bound by his acts. He is estopped from denying that Hart charged himself as guardian. He cannot set up that Hart acted fraudulently or wrongfully in cancelling the notes. Hart's administrator is irrevocably bound to the wards, if they sue for the money. If now in Court, against Hart's administrator or heirs, could any defence be made to them ? And if Williams at the same time claimed on account of a payment to Moseley, the Court must decide in favor of the liability to the Farmers, and Williams must lose his debt, by Moseley's act, or he is now released.

Williams has, on the same principles, lost his right of contribution against Tom Peter Chaires. As to joint and several liabilities, see Cheetham *vs.* Ward, 1 Bos. and Pul., 633. Nicholson *vs.* Revel, 4 Adol. and Ellis, 675. Cited and approved, 4 Meeson and Welby, 465.

As to sureties rights in general, and duty of obligees—Samuel *vs.* Howarth, 3 Merivale, 272. Nisbet *vs.* Smith, 2 Bro. C. C., 579. Reess *vs.* Benington, 2 Vesey, Jr., 510, and notes. Exall *vs.* Partridge, 8 Term R., 308. Bowmaker *vs.* Moore, 7 Price, 234, (3 Eng. Excheq. 38.) Combe *vs.* Wolfe, 8 Bing., 156.

As to alteration—3 Maddock, 120, 221. 15 Eng. C. Law, 44 and 514. Master *vs.* Miller, in Smith's leading cases, vol. 1, 599, American notes.

V.—1. Moseley having acted in *auter droit* in his settlement with Hart, and now suing on *the same right,* is as much estopped by his own acts, as if acting in his individual capacity in both cases. He

can no more be allowed to do that which would be a fraud upon parties, than he would if acting in both cases for himself.

2. If A. holds B.'s note, and renders him an account, in which the interest on the note is calculated, and the whole interest and principal is added up with other items, and placed to A.'s credit, and B.'s debit on another account, and A. takes B.'s receipt and discharge on the account rendered, and uses it to discharge himself as so much cash on the last account, and gives B. the note which B. cancels, and after B.'s death the cancelled note comes by any accident into A.'s hands, and he sues and recovers the money from B.'s surety, it is a fraud upon B.'s representatives and on his surety.

3. It is not less a fraud, if he does it as executor.

4. Patrick Smith cannot against his will use his name, and make him do that which it would be a fraud for him to do himself.

VI. Moseley can have no greater rights certainly against Hart's surety, than he could against Hart, if now alive, or when he was alive. When Hart was alive, Moseley had not possession, or right of possession, of the note, and certainly no right of action, when it would have been a fraud to recover. Then what sort of a *legal title* had he in the note ? And when and how did he get back his right of action ?

If Hart's death could by possibility have carried forward a right to sue on an extinguished note—to Smith, or the Farmer's—it could not carry *it-back to Moseley as executor*.

VII. Nothing can better exemplify the true merits of the case than the admission, " that if Hart had actually paid the cash, the whole matter would have been proper, and no action [sustained, though Moseley had at once paid it back."

The law never compelled parties to do so vain an act. It would be strange, indeed, if all the rights of all the parties depended upon so idle a ceremony, ending in the same receipts, cancellations, debits, credits, discharges, rights, duties, and obligations, precisely as we contend they now exist. *Common sense* has been appealed to as authority. May we not invoke it here, and *common usage* also ?— When two men owe a debt to each other, though in different rights, do they always pay the money, and then pay it back again, or pass receipts and papers ? Would not so idle and unusual a ceremony raise a suspicion that some fraud, or cloak for perjury was intended ?

R. W. Williams, Appellant, *vs.* W. . D. Moseley, for the use of P. Smith, Appellee.

BALTZELL, Justice.

This case has been twice argued with a zeal and ability proportionate to its importance and the interest felt by the parties in its decision.

It has received from the Court the consideration due to the questions involved and the great principles at stake, and though regretting a difference of opinion amongst the Justices, yet they proceed to give the results to which they have arrived.

A tract of land of 400 acres, belonging to the heirs of John Farmer, was sold at public auction on the 1st of January, 1841, and William W. Hart having become the purchaser executed his five notes with the defendant and Tom Peter Chaires as securities for the purchase money, payable in annual instalments of $960 each on the 1st days of January '41, '42, '43, '44, and '45. The notes were payable to Arthur Burney guardian of the heirs, and the sale was made under the order of the County Court of Leon County, upon the representation of the guardian that the interest of the heirs would be greatly promoted by the sale, that the lands were renting for only $100, whereas they were worth 10 or 12 dollars per acre, and the legal interest on what they would sell for would be equal to $400.

Burney died and Hart in December, 1842, was appointed guardian. Hart died about March, 1843, and Patrick Smith, who has instituted this suit in the name of Moseley executor of Burney, was appointed guardian in his stead. The counsel of both sides agree that the legal title in the notes was in Burney in his life time, and after his death in Moseley. Defendant's counsel support their position in this respect by reference to Chitty on Bills, 160, 358. "In the case of a bill payable to A. or order for the use of B., payment should be made to A. or his indorsee, and not to B." Other authorities are also cited by them to the same effect. Story on notes 130, 461, 130. To strengthen his case, plaintiff availing himself of a provision in the rules of the late Court of Appeals "that suits may be brought by a plaintiff for the use of another person named in the process or pleadings," has connected the beneficiary or equitable with the legal interest on the notes. So that there would seem to be no real difficulty as to the form of the action.

The general issue was filed in the case, and various positions are assumed in defence, mostly arising from the fact that the names of

defendant and his co-surety were cut off from the notes, whilst in possession of Hart as guardian. Before noticing these, it is proper to advert to grounds not taken in argument either in this Court or in the Court below, but which have been regarded as worthy of attention by the justices dissenting from the decision of the case. The first of these is, that Patrick Smith is not in fact guardian of all the heirs of John Farmer, but of a part only. Objections of this kind are not in general favored—if made to the person of the plaintiff they should be presented in proper time so as not to surprise—usually by plea in abatement, and the issue thus formed is first tried and disposed of. A plea in bar waives objections that could be presented in abatement, and especially admits the character in which the suit is brought. Archb. Pl. and Ev., 283, 167. 2 Phil. Ev., 447. 3 Ibid, notes, 331. 1 McCord, 468,470. 15 John., 228.— 1 Bibb, 604.

Other objections are also taken, such as that the sale was not made in conformity with the order of the Court, and the notes taken differently from its directions. These questions are not presented by the pleadings, and the appropriate time to decide them is when they shall be properly raised for adjudication. If the objections exist there should have been a plea alleging the failure of consideration; but there is none such in the record, nor is it pretended that Hart was disturbed in the possession of the land or that his title under his purchase has ever been questioned; indeed we see defendants have taken a mortgage of it for their indemnity. We therefore decline to notice these points. If requisite it might not be difficult to dispose of them satisfactorily and conclusively.

The main reliance of the defence is on the position that the receipt given by Hart to Moseley paid the notes and satisfied them.— It is admitted that Moseley is discharged by the receipt so far as Farmer's heirs are concerned. The question is as to its effect upon Hart, and it is only necessary to refer to the transaction to ascertain its true character. Moseley held the notes as executor of Burney; but they belonged not to the estate he represented, but to the heirs of Farmer, and Hart being their guardian was entitled to them. Moseley delivers them, and takes the receipt for his own protection. The transaction concluded, Hart obtained the notes, Moseley Hart's receipt. Hart got the notes not because he was maker and through a payment to Moseley; (for it is not pretended that money or consideration of any kind passed) but as guardian. It is difficult to

see how Hart can claim under the receipt, it was Moseley's not his. So far from Hart deriving an interest by the receipt, it is on the contrary evidence of Moseley's having derived an interest from him. So far from relieving him from responsibility it creates a duty, and involves accountability upon him. To make the receipt a payment to Moseley, is to make Moseley debtor to Farmer's heirs, thus destroying the entire legal effect of the receipt, and the design of the parties in executing it. Such an idea was never entertained by the parties at the time of the transaction nor afterwards, and is not in our opinion the fair import of the agreement which is to be taken or considered in reference to all its parts. Hart retained the notes as they were received from Moseley until his death—returned them in his guardian account as the notes of his wards, distinct from cash—retained his own name in the notes, whilst he cut off, or permitted the names of his securities to be cut off, showing that he did not consider them as paid. The Judge of Probate too charged the notes to him separate from cash. But the relation which the two parties Moseley and Hart occupied to the subject we think is conclusive, if anything were wanting. They were co-trustees to the infant heirs of Farmer, Moseley having the naked legal title while on Hart was imposed the duty as guardian of taking charge of the notes, and the money obtained from them until his wards came of age. A receipt by one to the other on parting with their possession would have the effect merely to devolve on the party receiving the peculiar duty and responsibility of collecting them as in the case from Chitty, of a note given by A. to B. for the use of C. C. gets the note from B. and gives a receipt for it, this is no discharge of A. The only effect is to relieve B. of the responsibility, if there be one, of collecting the note. Hart, however, through means of the receipt obtained possession of the papers, and the true question is not whether the receipt constituted a discharge, but whether through this possession, thus uniting the two characters of maker of the notes and guardian, there was in law an extinguishment of the debt.

That in case of an executor indebted to his testator such a result would follow is very fully settled, though we shall find that the grounds upon which it has been permitted to operate are various and conflicting both in this country and in England. The probability is that it is a consequence of the enlarged interest in the estate of the testator allowed by the law at a very early period to the executor already referred to by this Court in the case of Colquitt *vs.* Faunt-

leroy. In the leading case on this subject, that of Wankford reported in Salkeld, we find a difference between two very eminent judges Lord Holt and Justice Powell, the latter remarking "some books say the action is gone, some say the debt is gone, and some say *the debt remains*, they will all be reconciled by this, that the debt will be assets," that it was by way of legacy or gift of the debt, and not by release, &c. The Chief Justice said, "as the person entitled to receive it is also the person that is to pay it, that amounts to an extinguishment." Salk., 303.

In Massachusetts the Court say, "It is not always a legacy nor a release nor extinguishment of the debt. It is more correct to say that although the duty remains, the right of action is discharged because the executor can't sue himself." Stephens *vs.* Gaylord, 11 Mass., 269. In New York it is considered in "the nature of a specific bequest of the debt not to be paid unless there are assets sufficient to pay the debt." Marvin *vs.* Stone, 2 Cow., 781.

Notwithstanding the rule we shall find that an executor could be sued by a creditor of the estate at law always, and charged with his debt as assets. Will. on Executors, 937, 945. Freshly *vs.* Fox, 9 B. & C., 130.

So also he will be charged in equity at the suit of a legatee, distributee or next of kin. Toller, 274. 2 Cowen, 781. 3 Brown Chy., 111. 3 Ibid Par. Ca., 607. 11 Vesey, 90. 13 Ibid, 262.

By statute the rule has been abrogated with us both at law and in equity as early as 1834. Duval, 188. It never was applicable to an administrator in reference to whom it is said "the appointment being by the mere act of the law, and a temporary privation of the remedy only the debt is not extinguished—the action merely is suspended during his administration; but revives after it ceases."— Toller Ex., 349. Will. Ex.. 937, 946. 2 Black., 512. 1 Salk., 306. Story notes, 543.

1 Siderfin, 79, was the case of an obligor appointed administrator who had died, and his executor was sued for the debt by an administrator de bonis non, of the first intestate and a recovery was had. 8 Co., 136. Keble, 313.

No authority has been cited showing the application of the doctrine to guardians, and we have been unable to find such ourselves. If applicable it must be by some analogy to the office of executor, and we propose to enquire whether any such exists. The civil law is more full and clear as to this relation than ours, and we propose to

refer to it in connection with this subject commended as it is by those two eminent jurists the late Judge Story and Chancellor Kent. "It is equally a provision of religion as of law that those who are deprived of their father during their minority should be put under the conduct of some one who will fill the place of a father as far as possible, and be charged with their education, and the care of their property, who is termed a guardian." Domat, 171.

"His power and authority extends to all that can be necessary for the faithful management of the affairs of the ward—he is esteemed acting for his ward *when he rightly manages the estate, not when he wastes and destroys it.*" Ibid, 171.

"He cannot give away the goods of his ward nor surrender any right he has, nor even diminish it, nor impose on the estate new burdens, nor can he impair, nor render worse the condition of his ward—he has no power but to *preserve the property* of his ward not to injure or destroy it." Ibid, 176.

The same principles are maintained and asserted by the common law. "The authority of the guardian extends only to such things as may be for the benefit and advantage of the infant whereof he may give an account." Bac. Ab. Guard., 684. Co. Litt., 89, a. 7 John., 557.

He can do no act to the injury of the ward. 10 John., 441.

"The Court will not suffer an infant to be prejudiced by the laches of his guardian." 1 Black., 463, n. 11.

"When it can pronounce a contract to be to the prejudice of the infant, it is void." Maule & Sel., 482. 2 Hen. Black, 511. 2 Mason, 82.

He cannot set aside an award favorable to his ward. 4 Bibb, 437.

In law he is the mere *bailiff or servant* to the infant, and liable to account which an administrator or executor was not subject to except by statute. 2 Bacon's Ab., 687. 1 Black., 643. 1 Com. Dig., a. 2.

Now account lies not for wrong or waste, but only for money paid. 1 Com. Dig., a. c., 192.

As servant or agent he can only discharge on receipt of the money due. Story's Agency, 170, 437. Paley, 262.

He cannot release a debt even to make a debtor witness for his ward. 3 Cond. Eng. Chy., 235.

His powers and duty seem to bear a very near, if not complete resemblance to those of an administrator *de minore œtate* who "may

pay debts of the estate—sell and dispose of the goods if perisha-
ble, retain for his own debt—receive debts due to the testator, and
discharge and acquit them on payment. But he is only in nature
of a bailiff, and ought to account to the executors—has no authori-
ty to transfer the property by sale except in case of necessity nor to
release a debt without actually receiving it." Toller Ex., 405–6.
1 Com. Dig., ad. F., 1.

There is no power here to give receipts without payment nor dis-
charges without satisfaction—the power obviously results from the
duty, and extends not beyond it; it is to guard, protect, and save the
goods and property of the ward during his infancy, and turn them
over when he comes of age. The moment the guardian attempts
wrong or injury the law intervenes to prevent it by declaring his im-
potency, and the nullity of the act. Especially we have seen that
there can be no bequest, gift or other circumstance in the case of a
guardian as in that of an executor to create an extinguishment of
the debt. Nor is it by any means clear that if the note were dis-
charged by extinguishment as to Hart, the other makers, the defen-
dant and Chaires, would be exonerated by it. " A discharge of one
joint maker of a note by mere operation of law, and without any
act done by the creditor will not discharge the other maker." 13
Mass., 148. Story's Prom. N., 502.

Again " Extinction of the debt as to the principal, in general dis-
charges securities, except when it arises from causes such as bank-
ruptcy, which originate with the law and not in the voluntary acts
of the creditor." Theobold, 73. Brown vs. Carr, 7 Bing. 508.
2 Russ. 600. Other cases relied upon " as precisely in point," are
to the effect that " because a guardian could not sue himself, it, the
debt, shall be presumed to be paid, and he and his securities on the
guardian bond shall be liable." Dudley's S. Carolina Reports.

Literally construed, this authority asserts that if A., indebted to
an infant, be appointed his guardian, the debt is presumed to be paid,
(that is, discharged and settled,) and this is the construction conten-
ded for by defendants' counsel. Now it is obvious that if this be
true there is no liability on the part of any one; and the principle
asserted by the Court is directly at variance with their adjudication.
But we do not so understand it, nor the numerous cases to be found
in the American Courts on this subject. In none of them was the
question raised as to the liability of the original debtor, whether sued
upon the debt in its original shape, or upon the guardian or adminis-

tration bond.   Can it be pretended that to a suit instituted for the re-
covery of this debt the party could invoke the presumption of pay-
ment through his appointment as guardian or administrator as a
means to defeat the suit against him ?   We think not.   The ques-
tion in the cases alluded to was, whether such indebtedness of the
guardian or administrator of themselves, were sufficient to make the
securities liable, and such liability was asserted on the ground that
as an officer he must be presumed to have discharged his duty ; and
their liability was the result of such presumption.   But it is diffi-
cult to perceive how a rule of law whose obvious effect is to enlarge
and extend a liability, indeed to give new names and further secu-
rity, can be invoked to impair, defeat and destroy one already in ex-
istence.   To discharge the principal under such circumstances
would be to overthrow the cases referred to : for obviously without
an obligation on the part of the principal there can exist none a-
gainst the security ; it would be to set up the doctrine of extinguish-
ment as to administrators and guardians which we have seen uni-
formly denied from the commencement as to the former, and oppo-
sed to every principle and analogy as to the latter.

A class of cases invoked by defendant maintains that where an
executor or administrator is also guardian, the responsibility is de-
volved by operation of law from the securities of the one to those of
the other.   These go upon a like presumption that the officer has
discharged his duty, and that neither he nor his securities on his of-
ficial bond can excuse themselves from responsibility by alleging a
failure of duty.   But upon another ground it is clear to our minds.
An administrator or executor is the agent or trustee for creditors,
legatees and distributees ; so soon as he becomes guardian for a mi-
nor having money in his own hands, his joint agency ceases as to
this by operation of law ; he then holds the money as the individual
agent of one instead of all his former *cestui que* trusts.   If he gives
bond as guardian, his securities become liable for this separate agen-
cy, displacing by necessity his former joint action and the responsi-
bility connected with it.

A further illustration may serve to explain : A. is agent for sev-
eral individuals connected in business ; they dissolve and he is
made agent by one of those having a large amount of money in his
hands derived from the old association ; his employment and posses-
sion of the money continue under his new relation.   It is very obvi-
ous that this separate and individual agency supercedes and displa-

ces the former joint agency and responsibility, thereby creating new liabilities. If a new bond were given, the relation of the securities under the new and old arrangement would necessarily be altered; and such we apprehend is the case with the offices of guardian and administrator. But any way considered we do not see that the law of these cases is applicable to the case of this defendant. Hart was never executor or administrator of Farmer's estate so as to transfer a responsibility from the securities on an administration bond to those on his guardian bond.

It is a mistake, too, we think, to suppose that the securities on these notes occupy a more favorable position than the securities on the guardian bond. In establishing the liability of the latter, it by no means follows that the former are discharged. In the case of Fox vs. Alexander, decided by the Supreme Court of N. Carolina, the guardian had traded a note of the ward's in payment of his individual debt. The ward coming of age recovered the amount of his debt against the securities on his guardian bond; the latter filed their bill, alleging the insolvency of their principal, and praying that the payers of the notes be compelled to pay to them in preference to the person to whom the note had been traded; the Court say, they (the securities on the guardian bond) have a right in a Court of Equity to stand in the place of the ward and follow the trust fund and recover satisfation to that amount now in the hands of the defendant or in the master's office." 1 Iredell, 341.

To the same effect is Powell vs. Jones in the same Court Ib. 337.

Reliance is placed on the 40th section of the act of the Legislature, Duval, p. 178. But to bring the case within that provision there must be "a discharge given by an executor, administrator or guardian of a debt, &c., belonging to a minor." Now we know of no discharge given by Hart to Williams and Chaires except the cutting off their names can be regarded in that light. But the design of the law must be construed to mean not an act of waste or spoliation, but of lawful and rightful discharge. It would be a forced and most violent construction to suppose that the Legislature designed to make an act such as we have been considering, a discharge binding upon a minor and orphan.

Another position is, that "the notes were in fact and in law cancelled and discharged as soon as Williams' and Chaires' names were cut off by Hart, and this, if it were done even through fraud." If a guardian cannot make a contract to the prejudice of his ward,

he cannot without payment legally destroy one already made. There is no where within our knowledge a law written or unwritten, a rule or principle of any court professing to administer justice, which permits the improper mutilation or defacing by an officer, of the evidences of title or of debt entrusted to his charge. So far from it, there are prohibitions of every various character, civil as well as criminal, against such profanation. We could not well give our sanction to a doctrine more mischievous in its results or more disastrous to the peace, the morals, and the dearest interests of society. If a guardian may discharge a debt due to his ward by tearing or cutting up the note of his ward, and more particularly discharge a debt of his own by such expedient, why may not all other officers having a trust and charge protect themselves after this fashion, and pay their debts also—and with less criminality on their part, representing as they do the interests of those able to protect themselves; whilst guardians have the weak and the helpless children alone confided to their charge. But if this doctrine is to prevail, what is to prevent its extension to deeds, judgments, bills of sale, and the records of the Courts? Why may not mutilation pay debts evidenced in this manner as well as notes to a guardian, and thus riot and spoil become the order of the day?

But the law is not subject to such reproach. "The principle is well settled," says the late Justice Story, "that the obligor shall never take advantage of his own wrong, and that his own deed fraudulently or innocently destroyed by himself without payment, does not thereby lose its legal obligation ; and the principle applies still more strongly where there are sureties." 1 Gallison, 74. 2 Mason, 2. Olcott *vs.* Rathbone, 5 Wendell, 492. Mitchell *vs.* Cotten, decided at this Term. Equally clear is the doctrine in cases of notes and bills of exchange. Chitty on Bills, 143. Bailey, 358.

Turning to the facts of the case we find no ground for indulgence favorable to the case of the defendant, or to the action of the guardian. These notes were evidently designed by the County Court, under whose orders and by whose direction they were taken, as a permanent investment in lieu of the land of the minors; they were payable after the long interval of five years, and from all that appears in the record were well secured; there seems to have been no necessity for their collection or a change into other notes, with a view to different security. They might have remained with the guardian unaltered, and his duty was not to change them. If a
42

change had been indeed made in good faith with a view to better security, or even if the securities had paid such as were due, or the guardian having the money in hand for the purpose of payment had returned it in his account to his debit as cash received, there might be a color in the position that the securities were discharged.

But to hold it so, under the circumstances of the case would be to declare a discharge because Hart got possession of the notes as guardian, or gave a receipt to procure their possession from one having their temporary charge or custody, or because somebody else may be responsible for their payment. Such is not our opinion. We hold them to be contracts preserved from injury and maintained in force by a fundamental law prevailing at the time of their execution, acknowledged as well by the Constitution of the United States as by this State and every State in the American Union, operating against every action of the legislature or any other power to weaken or impair them.

The case of Dickinson *vs.* Lockyer, decided by Lord Loughborough bears a near resemblance to the case under consideration, and we have thought it worthy of particular notice. It was a suit brought by an administrator de bonis non, to recover from one of three obligors on a bond which had been delivered up to him and cancelled. The defence was that Lockyer, the general devisee of the estate of Furze (the original obligee) in trust for the widow and children, (with whom the bonds were left by the executrix) had settled and discharged them. They were due by himself and two others as partners, and on a settlement between him and his partners he delivered them up. The defendant contended that but for this arrangement he would have retained assets from the firm—that Lockyer being the agent of the widow and being in possession of the bonds, he was the only person to whom the money could be paid, and that the delivery of the bonds by the executrix to him amounted to an assignment. The Court after saying he was not executor but trustee, and that Bener had notice of the trust say : "*they took the seal off the bond, but that is not payment*—then what is the consideration ? *there is none as to the estate of Furze, but it is a personal consideration to the trustee. This would not do as a payment at law.* The question in this Court is whether the trustee of a bond can without the *cestui que trust* release the obligor. This a very particular case for he is debtor with the two others. *They cannot by management amongst themselves destroy that security. There was no real payment of the*

R. W. Williams, Appellant, *vs.* W. D. Moseley for the use of P. Smith, Appellee.

*money* into the hands of Lockyer as money belonging to the estate of Furze to be laid out according to the will. Three co-obligors in a bond by a transaction between themselves, agree that one shall be discharged and the whole security rest upon the two without the privity of the executor."

It is not necessary to enquire what would have been the case if actual payment had been made, and the money was in the hands of Lockyer, &c., &c. The defendant was declared liable although the Court said it was a very hard case, they all meant well, &c., and excused them from costs. 4 Vesey, 40.

Another objection is that Chaires a co-security was excluded as a witness. But we are of opinion there is no error in this. 1 Greenleaf, 440. 2 Phil. on Ev., 1521, notes.

It is next contended that, as these notes are payable "*in current Florida money*" the value of Florida money only should be recovered, by which is meant that a depreciation should be allowed. To solve this question presents the enquiry as to the legal signification of the terms " current Florida money." Do the words " current in Florida" qualify the word " money" so as to change its meaning ? We think not. The legal signification is certainly not as contended for. If it be insisted that the popular acceptation is to govern, and not the legal it would be difficult to establish even then we apprehend that current money means differently or otherwise than that the bank notes or specie shall be current and pass for what they purport to be worth. If depreciated they cease to be "*current*" wherever the depreciation exists. When this takes place, though the note may be the subject of barter as unsound goods or bad merchandize, it ceases to be money. No longer " a standard by which to measure the value of other things," it is itself subject to measurement to ascertain its own value.

The Court of Appeals of Kentucky, where this subject was discussed and considered with great care under circumstances greatly resembling ours, decided that the terms " current money of Kentucky" mean that kind of money made current by an act of Congress which is the only current money of Kentucky. The same Court in Bainbridge *vs.* Owen interpret " current money to mean constitutional coin." 2 J. J. Marshal, 463.

The Supreme Court of Missouri say, " gold and silver coin by the constitution of the United States constitutes the ' current money of Missouri' as well as of all the other States of the confederacy."

9 Miss., 703. So also notes payable in Tennessee money, and in Arkansas money were held payable in gold and silver. Searcy *vs.* Vaner, Mar. & Yerg., 225. 1 English, 225. We are then of opinion that there was no error in taking the sum fixed by the note as the true measure of damages.

The judgment in this case was rendered on the 23d of May, and as the term for Leon County is directed by law to commence on the 4th Monday of April, and the term of the Court in Gadsden intervened after that period, and before the date of the judgment, it is therefore urged that the Leon Court must have been continued by adjournment beyond the term in Gadsden, and that this could not be legally done. It might be safe we apprehend, to rely in answer to this objection on the decision of the Supreme Court of the United States in the case of Hopkins *vs.* Lee, in which the Court say, " the power of adjourning to a distant day is common to all Courts." 6 Wheaton, 106. 4 Cond. R., 22.

We think independently of this, that the power will clearly be found to be by law with the Courts of this State. " By the common law at the earliest period throughout Christendom, the whole year was one continual term for hearing and deciding causes; for the Christian magistrates to distinguish themselves from the heathens who were extremely superstitious, went into a contrary extreme and administered justice on all days alike." 2 Black., 276. 6 Jacob L. D., 210.

At a later period the Courts of Westminister Hall were prohibited from transacting business on certain holy seasons as Advent, Christmas, &c., on Sundays and some particular festivals, yet this prohibition did not extend to the Court of Parliament, the Chancery nor the Inferior Courts." 6 Jacob L. D., 210.

At the earliest period of our Territorial existence the common law of England of a general nature, and all statutes of a general nature, and not local to that Kingdom, are declared in force and are continued to this day. Duval, 357.

By a law of Congress it was provided "that the Judges of the Superior Courts shall have power to order extra terms of said Courts or to adjourn them to any other time or place when the public interest may require it, and when from sickness or other cause the judges cannot hold the regular terms, giving due notice of the same." Laws of Congress 1828.

Such was the state of our law to the year 1839, the time of the

formation of the State Constitution, and the framers of that instrument so far from altering or repealing the statute and common law of the Territory in this respect, re-enacted them by that remarkable provision of Magna Charta, "all Courts shall be open, and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." Thus by the paramount power has the ancient rule of the common law been declared the paramount and fixed law of the land. It is insisted that because the Courts are directed by law to be held on certain days, this is in the nature of a prohibition to hold at other times. Not admitting the power of the Legislature to abridge the action of the Courts, thereby closing them in effect, and denying, and delaying justice, in opposition to the express language of the constitution, we by no means admit that such direction is at all inconsistent with the power contended for. The fact that the power to hold extra terms existed in the Territorial Government all the time in conjunction with this direction to hold Courts on particular days, without conflict and without any supposition of contrariety is a conclusive answer. Indeed the use of the term extra precludes the idea of conflict, it is not a provision for the regular term fixed by law; but for a term beyond it required by the public interest, or when the regular term has not been held. If we are to be restricted to the very words of the law, and because the Legislature has said the Courts shall be held on the first or other Monday of a month, as is, and has been the case in all our public acts, be required to say that they are confined to the very day, then the entire business must be despatched on that day and no other, there being no authority by law to continue beyond. But where is the reason and propriety of such restriction, why is it that such a rule is to apply to the Courts to whom alone of all the public agents the emphatic language of the constitution has been so specially addressed.

The other departments of Government, the Governor, Treasurer, Secretary of State, Judge of Probate, all transact their business whenever required. We venture to say that there is not a doctrine or rule, or principle, of any law sustaining such a distinction, and that it is wholly opposed to propriety and reason. Can it be pretended that a direction to an agent to transact business on a particular day, or a particular hour of a day, is a prohibition to do it at another hour or another day? We imagine not. If authority were needed, we have

it expressly in point. "A question sometimes arises whether, when a statute points out a particular mode for the performance of some act therein commanded, its enactments shall be taken to be imperative or only directory; in the former only of which cases, an act done in a different mode from that pointed out by the statute would be void. A clause is directory when the provisions contain mere matter of direction and no more, but not so when they are followed by words of positive prohibition; thus the statutes which *direct the quarter sessions to be held at certain times* of the year are construed to be directory, and the sessions held at other times are not void." 1 Smith's lead. cas.. 170. Rex *vs.* Jus. Leicester, 7 B. & C., 6. 2 Ad. & El., 96.

So in Frazier *vs.* Willey, decided at the present term of this Court, "Statutes directing the *mode of proceeding* by public officers are advisory and not essential to the validity of the proceedings, unless it be so expressed. 8 Vermont, 280. 6 Wend, 480.

We have spoken of the act of Congress of 1828 as operative on this subject. That it is in force it is only necessary to refer to the schedule and ordinance of the Constitution, declaring "that all laws and parts of laws now in force, or which may be hereafter passed by the Governor and Legislative Council of the Territory not repugnant to the provisions of this Constitution, shall continue in force until by operation of their provisions or limitations the same shall cease to be in force, or until the General Assembly of this State shall alter or repeal the same." If any doubt existed as to the construction of that act, a transposition of its terms would remove them; thus, the judges shall have power to order extra terms when the public interests may require it, and when from sickness or other cause the judges cannot hold the regular terms, they shall have power to order extra terms.

By law of the State, "the jurisdiction of the Superior Courts of the Territory was conferred on the Circuit Court of the State." Acts, 1845, p. 9.

We hold then, that the action of the Court below, in giving judgment in this case at the time was not illegal nor prohibited, but has the sanction of the constitution and laws of the State.

The Judgment is therefore affirmed, with costs.

R. W. Williams, Appellant, vs. W. D. Moseley for the use of P. Smith, Appellee.

LANCASTER, Justice.

This cause comes by appeal from Leon Circuit Court. It is an action of assumpsit brought by William D. Moseley administrator of &c., of Arthur Burney, deceased, who sues for the use of Patrick Smith guardian of the heirs of John Farmer, deceased, against Robert W. Williams on three promissory notes, of which one is of the following tenor:

" By the first day of January next we, or either of us promise to pay Arthur Burney, guardian of the heirs of John Farmer, deceased, nine hundred and sixty dollars in current Florida money for value received, bearing interest at 8 per cent from date, this the 2d day of January, 1841.

[SIGNED]                          "WILLIAM W. HART."

The other two notes are of the same tenor, date and amount, and signed in like manner by Hart, but they vary as to time of payment one being payable by the first day of January, 1843. The other by the first day of January, 1844.

To the Plaintiff's declaration, the defendant pleaded the general issue of non-assumpsit. On the trial the plaintiff gave in evidence the notes aforesaid, also the deposition of Susan C. Murray who proved that she knew the notes sued on. That she had seen them in Wm. W. Hart's possession, and that they were in his possession at the time of his death, and that when she first saw the notes, besides the name of William W. Hart, they had on them also the names of Robert W. Williams and Tom Peter Chaires. That sometime in March, 1843, Chaires came to see Hart, who was sick. After some conversation between them (of which she heard but little) Hart asked for his pocket-book and a pair of scissors, which she gave him. After Chaires had left she saw several small bits of paper on the hearth, with Mr. Chaires' and Col. Williams' names written on them—afterwards saw the notes and Col. Williams' and Mr. Chaires' names were cut off—heard Mr. Chaires say when at Hart's that he wanted his brother, Green Chaires, to do some business for him which he refused to do unless his (Tom Peter Chaires') name was taken from the notes. Witness says that the consideration for the notes sued on, was a tract of land purchased by Hart from Ar-

thur Burney, guardian of the heirs of John Farmer, deceased, of whom she was *one*. She was Hart's wife—and Chaires and Williams were securities on Hart's notes. Says also that Hart settled with Burney as her guardian, her share of the estate in his hands. Plaintiff also gave in evidence a copy of a mortgage from William W. Hart to Robert W. Williams and Tom Peter Chaires, to secure them for becoming his securities on said notes for his benefit and accommodation. Also three receipts in the hand writing of Wm. D. Moseley the plaintiff, with the endorsements on them, but signed by Wm. W. Hart. One is as follows:

" Received of W. D. Moseley, executor of Arthur Burney, deceased, thirteen hundred and sixty-five dollars and six cents, in part payment of the amount due Rufus Farmer from said Burney as his guardian, as per account current, rendered this day, January 1st, 1843.

[SIGNED] WILLIAM W. HART,
Guardian of Rufus Farmer.

[ENDORSED.]

| | | |
|---|---:|---:|
| Book acc. | | 6 26 |
| Your note due 1st January, 1843, | 960 00 | |
| 2 years interest 8 pr. ct. | 153 60 | |
| | | 1113 60 |
| Your note, ' | | 6 00 |
| 1 yr. interest, | | 0 48 |
| Your note, | | 66 00 |
| 1 yr. interest, | | 5 28 |
| J. J. Hart 169 less, | | 155 48 |
| Hire of Comfort for yr. 1843, less interest, | | 11 96 |
| | | 1365 66 |

Other two receipts in same form, also for money dated same day, each for the sum of $1757 79-100, signed ' Wm. W. Hart, guardian of Argyle Farmer' and 'Wm. W. Hart, guardian of James Farmer,' with the other two notes sued on, and other notes, and interest computed on all amounting to the sum of $3515 59, which was equally divided to make the last mentioned receipts—endorsed thereon as account rendered.

Plaintiff also gave in evidence a statement marked F. as follows, to wit:

R. W. Williams, Appellant, *vs.* W. D. Moseley for the use of P. Smith, Appellee.

1841. Amounts of sale and hire of the land and negroes belonging to the estate of John Farmer, dec. :

Jan. 1. Sale of land to W. W. Hart,       ·     $4,800 00

Hire of Ellick,     235 00

"   of Ben,     161 00

"   of Comfort,     6 00

"   of Eliza,     57 00

"   of Amanda,     50 00

"   of Lina,     60 00

"   of Jane,     60 00

" This is a true statement of the sale and hire of the land and negroes of the estate of John Farmer, dec., this March 9th, 1841.

ARTHUR BURNEY, Guardian."

Sworn to, March 17th, 1841, before D. McRaeny, Clerk, and filed in his office.

Also a statement of Wm. W. Hart, guardian, from which statement the following is extracted, as referring to this cause:

" Wm. W. Hart, guardian in account with James, Argyle and Rufus Farmer :

Received of W. D. Moseley, executor of A. Burney, dec., in Cash,     $ 40 00

In notes and accounts,     3,463 00 "

" The above is as near correct as I can at this time make it, being very sick.     W. W. HART, Guardian."

Some debits then follow for negro hire, not needful to be stated here, also signed by Hart, guardian. To which is appended the following :

" I charge the guardian, as per account stated above, Cash,     40 00

Notes and accounts,     3,463 00

Hire of negroes for 1843,     250 00

    ——————

    $3,753 00 "

" The credits asked are not sustained by vouchers, and are suspended. June 5, 1842.     J. E. BROOME, Judge Leon C. C."

The plaintiff, then gave in evidence certified copies of three guardian bonds of Patrick Smith, dated 23d day of December, 1843.— One as guardian of Argyle Farmer, another as guardian of James Farmer, and a third as guardian of Rufus Farmer, all minors. Also a guardian bond of Arthur Burney, dated 24th November, 1843,

43

R. W. Williams, Appellant, vs. W. D. Moseley, for the use of P. Smith, Appellee.

as guardian for Susannah Farmer, Edward Farmer, James Farmer, Argyle Farmer and Rufus Farmer, minors, and five in number. Also another bond of said Burney for the sum of ten thousand dollars, dated 14th February, 1840, conditioned to make a faithful and legal application of the proceeds of the sale of the real estate of the infant children of John Farmer, dec. Also the petition of Arthur Burney for leave to sell said real estate—representing it to be for the interest of his wards. And the order of the Judge of the County Court thereon, in these words, to wit:

"A bond having been filed by Arthur Burney, Sen., and his securities, satisfactory to the Court, it is therefore ordered by the Court, that on the first day of May, in the year 1840, Arthur Burney, Sen., guardian of the children of John Farmer, sell to the highest bidder the lands described in this petition aforesaid on the following terms: 1st. Notice to be given for two months previous, of the time and place and terms of sale. 2d. The terms shall be one-fifth of the purchase money payable on the 1st of January, 1841. One-fifth January, 1842,—and the balance in three equal annual instalments; the purchaser to give a joint and several bond, with three securities. The bond shall bear interest ·from this date; the interest shall be paid yearly. It is further ordered, that if it appear to the said Arthur Burney, Sen., that William W. Hart, in right of his wife, is entitled to one-fifth of said land, that then if the said William W. Hart and wife will execute an assignment of their rights, titles and interest to the same to the purchaser, the said Arthur Burney shall deliver over to W. W. Hart the bond which shall become due on January, 1841.

[SIGNED.]            W. M. GIBSON, Judge."

Also an order dated December 13th, 1842, appointing Wm. W. Hart guardian of the estates of James Farmer, aged 12 or 13 years, and his younger brothers, Argyle Farmer and Rufus Farmer, all children of John Farmer, dec., on his entering into bond, &c. Also three guardian bonds of the said Wm. W. Hart, in the sum and with the securities named by the Court dated 16th September 1842. One as guardian of James Farmer, another as guardian of Rufus Farmer, and a third as guardian of Argyle Farmer. And here the Plaintiff rested his case.

The defendant offered Tom Peter Chaires as a witness. But plaintiff's counsel objected to his competency on the ground of

R. W. Williams, Appellant, *vs.* W. D. Moseley for the use of P. Smith, Appellee.

interest, and relied on the deposition of Susan Murray and after proofs to prove that interest ; which objection, after arguments, the Court sustained, and excluded the witness. To which ruling of the Court defendant by his counsel excepted.

Thomas Lang called by defendant, proved that part of the land mortgaged by Hart to Williams and Chaires, had been allotted as' dower to Hart's widow, now Mrs. Murray the witness in this case. That he is administrator on Hart's estate having succeeded the Sheriff who acted some time *ex virtute officii.* That the estate of Hart is insolvent. Witness said that the notes sued on had never been in the possession of the Sheriff nor in possession of witness. That he had other notes in his possession on which the name of Hart remained, and from which the names of sureties had been clipped, which had been satisfied. That these notes were not the only papers in Hart's possession at the time of his death, which witness was entitled to possess, and which had been taken by some person without authority. That he knew of his own knowledge a great many other papers had been so taken.

David S. Walker called by defendant, proved that in the conversation he had with Governor Moseley, plaintiff in this' cause, said Moseley told witness that he, as executor of Arthur Burney, became possessed of the three notes upon which this suit is brought—that after William W. Hart was appointed guardian, he Moseley, as executor of A. Burney, delivered to said Hart, guardian as aforesaid, he having first exhibited his letters of guardianship, and his bond as guardian, which Moseley regarded as sufficient, the said notes, and took therefor the receipts of said Hart, as for so much cash—that he considered himself as then parting with all claim and interest which he, as executor as aforesaid, had in or to said notes—that he had always regarded the transaction in that light, and that, consequently, this suit to recover the amount of said notes in his name, for the use of Patrick Smith, guardian, &c., was instituted without his knowledge or consent—that if witness would let him know when the trial should come on, he would attend and state to the Court and Jury what he had then stated to witness. Witness further stated, that a day or two before the trial took place, Gov. Moseley was called, unexpectedly, on official business, to Pensacola, and that was the reason why the witness was called upon by the defendant to testify to the above facts, instead of the Governor himself.

This was the evidence offered.

After counsel had been heard on both sides, the counsel for defendant moved the Court to instruct the Jury as follows :

1st. That the notes sued on were the property of Arthur Burney at the time of his death, and the legal title to the same passed to Moseley, his representative, who alone had the right to sue on the same.

2d. That if they believe from the evidence that Moseley, as representative of Burney, voluntarily and without fraud, delivered up the notes in question to Wm. W. Hart, the principal obligor in the same, in consideration of the receipts offered in evidence, it operated as a divestiture of all title out of Moseley ; and therefore, that this suit cannot be maintained in his name.

3d. That if the Jury believe from the evidence, that William D. Moseley, executor of Burney, the payee of these notes, delivered them to Wm. W. Hart, the principal obligor, the defendant Williams was released thereby.

4th. That if the Jury believe from the evidence, that William D. Moseley, executor of Arthur Burney, deceased, agreed, in consideration of a receipt to him, as executor, of so much money as they called for, to deliver up, and did so deliver up said notes to Wm. W. Hart, the principal obligor, the same amounted to a release of the obligors thereto, and annulled and extinguished the notes.

5th. That if Wm. W. Hart, the principal obligor, came lawfully into possession of these notes, all liability on them, as securities, was extinguished, and Hart became liable, as guardian, for the money, as though the same had been paid to him in cash.

6th. That if Hart obtained the possession of these notes lawfully, he had a perfect right to destroy the same, and to cut off the names of his securities.

7th. That Hart's receipts to Moseley, offered in evidence by plaintiff, constitute perfect evidence of the payment of these notes by the principal obligor to the legal holder.

8th. That if the Court shall charge the Jury, that the legal title to these notes did not pass to Moseley, Burney's representative, then and in that case, the Court is requested to charge the Jury, that this suit cannot be maintained in his name, as instructed, in lieu of 1st instruction.

9th. That a suit cannot be maintained at law, in the name of any person, except the legal owner.

10th. That in the event of a verdict for plaintiff, he is only enti-

tled to recover so much as "current Florida money" is proved to be worth in specie at the time the notes fall due, and that this proof lies upon the plaintiff.

11th. If the jury believe, from the evidence produced by the plaintiff, that Moseley is the executor, and not the administrator, of A. Burney, deceased, then he cannot maintain this action as administrator.

All which the court refused to give, but gave instead thereof, the following instructions, to wit:

1st. Instead of 1st instruction asked by defendant's counsel, the court instructs the jury, that the notes sued on in this action, were the trust property of Arthur Burney, as guardian of the infant heirs of John Farmer, deceased, at the time of said Burney's death; and that the legal title to the same passed to his administrator or executor Moseley, in like character and effect in law, as it existed in his intestate, the said Moseley alone having the right to sue on the same.

2d. In lieu of the 4th instruction, the court instructs the jury, that if they believe from the evidence, that Moseley, executor of Burney, received from Wm. W. Hart the amount of the notes receipted for, in money, then the said notes, to the amount paid in money, were and are discharged.

3d. The court further instructed the jury, that the mere act of Wm. W. Hart, cutting the name of R. W. Williams, defendant, from the promissory note in question, cannot in any wise affect his liability, as one of the makers of said note; that if said note were void, said act was unnecessary in order to cancel it. And that if it were valid and binding in the hands of said Hart, he could not invalidate it, or release said Williams, by cutting off his name, or that of T. P. Chaires, as aforesaid; and that the jury should apply the evidence, under this and the other instructions of the court.

To which said several rulings and opinions of the court, the defendant, by his counsel, excepted.

It is also admitted by the plaintiff, that the court instructed the jury, that if they shall find for the plaintiff, that they must, in assessing the damages, find the same amount as if the notes were payable in money, instead of "current Florida" money. And it is admitted by the defendant, that Lang testified that he became administrator of Hart, on the          day of          , A. D.          . These

admissions to be part and parcel of the Bill of Exceptions, to the same extent as if the same were signed by the presiding judge.

JAMES T. ARCHER,
*for plaintiff*,
LONG & WALKER,
*Attorneys for defendant.*

The errors assigned are as follows:

1. The Circuit Court erred, in refusing to allow the defendant below to examine Tom Peter Chaires as a witness in this cause, or even to swear said Chaires as a witness.

2. The Court erred, in refusing to allow Thomas Lang to answer the question propounded to him, to which exception was taken, as appears from the bill of exceptions in this cause.

3. The Court erred, in refusing to give each of the instructions to the Jury, asked by the counsel of defendant below, numbered in the bill of exceptions from one to eleven, inclusive.

4. The Court erred, in each of its instructions to the Jury, set forth in the bill of exceptions, from one to three, inclusive.

5. The Court erred, in trying this cause, and pronouncing judgment in the same, on the twenty-third day of May, A. D. one thousand, eight hundred and forty-six, as set forth in said record,—the said 23d day of May, A. D. 1846, not being embraced within either of the terms of the Leon Circuit Court, as established by law.

LONG & WALKER,
*Atty's for Appellant.*

We will for the present pass over the first and second assignment of errors in this record, and consider the third and fourth. This brings before us the instructions asked by defendant below and refused, and also those which were given by the Court. And the first enquiry necessary to be made is, who are John Farmer's heirs? By reference to the bond executed by Arthur Burney it will be seen they are Susannah Farmer, Edward Farmer, James Farmer, Argyle Farmer, and Rufus Farmer. *Five* minors and infant children of John Farmer, deceased.

2d. What interest had Arthur Burney, guardian, in the notes' sued on at the time of his death?

It is admitted on all sides, and indeed is too plain to be denied, he was the legal holder and had the right to sue on them when past due. But they were made payable to " Arthur Burney, guardian of the heirs of John Farmer, deceased," and were not negotiable.

It is true the words guardian, &c., may be considered as mere *descriptio personam*, and do not necessarily include the idea that Burney took and held the notes as guardian. But the consideration on which the notes was given is explained by the testimony of Mrs. Murray. It was for the sale of the lands belonging to the five children and heirs of John Farmer, deceased, and if Burney strictly pursued his authority to sell, would vest the equity in the proceeds of the notes in his wards unless he has clearly shewn an election otherwise.

Did Burney pursue his authority for selling the lands of his wards? By reference to the order of the County Court it will be seen,

1st. He was to give notice for two months previous of the time, place and terms of sale. It does not appear by the record whether he did or did not; it is not shewn and cannot be inferred.

2d. The sale was ordered to be on the first day of May, 1840.— It occurred on the first day of January, 1841.

3d. The terms were five annual and equal instalments of the purchase money, the first on the first of January, 1841, and yearly thereafter. The purchaser to give joint and several bonds with three securities. He gave joint and several promissory notes with two securities.

4th. The bonds were to bear interest from the day of sale (1st of May, 1840.) The notes bear interest from the 2d of January. 1841.

5th. The interest to be paid yearly. By the notes it is payable when they respectively become due.

6th. The bonds were to be payable in money. The notes made payable in current Florida money.

It will be apparent to every one that Burney repeatedly, and in some respects materially, departed from his authority to sell. The difference in the value of the fund arising from the sale of the land was on the 1st of January, 1845, $542 62—it was so much less valuable than if the sale had taken place when directed, and interest had been payable as directed, by reason of the non-observance of the terms. But Burney never reported the notes to the Court as he took them, nor the securities he had taken to secure their payment. On the contrary he merely reported to the Court the sale of the lands, which is offered in evidence by the plaintiff, and hereinbefore set out. As much of it as here material may be correctly stated thus:

R. W. Williams, Appellant, vs. W. D. Moseley for the use of P. Smith, Appellee.

"1841, January 1st. Amount of sale of land belonging to the estate of John Farmer, deceased.

"Sale of land to W. W. Hart,                    4,800 00

"This is a true statement."

[Signed]                    "ARTHUR BURNEY,
                                            Guardian."

Which was sworn to March 17th, 1841, before the Clerk of Leon County Court, and filed in his office.

An enquiry naturally presents itself, what is the legal effect and import of this statement, and return made by Arthur Burney, guardian, to the County Court? No exhibit of bonds as required by the order of Court, nor of the notes taken, no mention of the securities or their number—nothing to show any departure from the order requiring the payment of interest annually—nor any effort to obtain from the Court an approval of his actings and doing in the premises. It must be considered an admission that he as guardian had in his possession $4,800 00 for the sale of the land, to bear interest according to law, and to be distributed among his five wards as they should respectively arrive at lawful age. He by his return bound himself as guardian, as fully for the purchase money arising from sale of the lands as he did for the hire of the negroes. Not having been ordered by the County Court (so far as appears) to put out this money at interest upon mortgage security as directed by the statute, see Thomp. Dig. p. 207, sec. 2, it results he retained it by leave of the Court, and bound himself to pay interest for it according to law.— He upon his own petition obtained the order of Court to sell those lands. He stood before the Court in the double position of *quasi* commissioner to sell the lands, and of guardian to the five heirs.— He does not as commissioner report what he has done, but as guardian what he has in possession. His authority to sell was not pursued, but departed from, and therefore cannot bind his wards. But his statement of having sold the land to W. W. Hart for $4,800 binds him, binds his securities, and binds Moseley his legal representative. Having elected merely to report the amount of the sale and being bound thereby as guardian—the notes taken to secure the purchase money, became his, not only legally but equitably.— The day he charged himself on the record as guardian with the amount of the sale, all equity in the notes taken to secure payment vested in him absolutely.

Moreover, Burney paid the share of one of the heirs to W. W.

Hart, her husband, and thereby extinguished the interest which she (Susan Farmer) had in the notes, so that *eo nomine* " heirs of John Farmer, deceased, could not be the claimants in equity of the notes or of their proceeds, his guardianship of her interests was surrendered to Hart her husband. But Burney was as appears by the testimony adduced and made a part of the record of this case, at the time of his death guardian of the four other heirs of John Farmer, deceased, to wit: of Edward Farmer, and of the three for whom after his death Wm. W. Hart was appointed guardian, and for whom after his death Patrick Smith gave bonds as guardian.— Burney having in his life time paid and settled the interest and claim of one of the heirs of John Farmer, deceased, it is not even plausible, that he was the mere legal holder of notes payable to " Arthur Burney, guardian of the heirs of John Farmer, deceased," for the use of the remaining fours heirs, and less plausible when a less number claim—suppose Burney in his life time had paid four of them and but one remained to be paid, might not that one with equal propriety claim the equity of these notes, as the three for whom Patrick Smith has given bond as guardian. If the plaintiff succeeds in this case, it is for his own benefit or for the use of Patrick Smith, or for the use of the heirs of John Farmer, deceased. If for the use of the heirs of John Farmer, deceased, it will be unjust because one of them has received her share. If for the use of Patrick Smith he has neither legal or equitable claim to it. If for the benefit of the plaintiff Moseley, he must shew a strict legal right.

The truth is, this suit is brought wrong to enure to the benefit of the heirs of John Farmer or any of them—if intended for the benefit of the wards of Patrick Smith, and if they have a joint interest, it should have been, James, and Argyle, and Rufus Farmer, by their next friend Patrick Smith, 4 J. J. Marshal, 389. Thomp. Dig., 326, sec. 5. If their interests are several their suits should have been.

The designation of Patrick Smith, guardian of the heirs of John Farmer, deceased, is not supported by the proofs on the record. There are five of them, he has given bonds as guardian for but three—and unless his claim is for his own use (and of that there is no pretence) he has neither legal or equitable standing in the case.

Waving for the present the legal liability which Burney in his life time had incurred by binding himself and his securities for the amount of the purchase money and interest accruing on the sale

44

of the lands belonging to Farmer's heirs—let us proceed to the time of his death and consider what follows that event. Moseley the plaintiff in this suit, took letters testamentary under his will and consequently became his legal representative. He examined the condition of his affairs, made himself acquainted with Burney's liability as guardian of the heirs of John Farmer, saw that he was bound on two bonds, one in the penalty of $5000, and another in the penalty of $10,000, conditioned for a faithful application of the proceeds of the sale of the lands, and for paying the heirs as they respectively attained lawful age. Saw that his testator had paid Hart, the husband of Susan, her share—and that there remained four to settle with. Saw that Hart had been appointed guardian of three of them. Examined his appointment and his bonds, and considered them good. Saw the return his testator had made to the County Court, and considered his estate bound for the amount. And being so bound that the notes sued on belonged to his estate. He knew moreover that the receipts of the newly appointed guardian for any debts, rents, or sums of money belonging to each of his wards would be a good discharge for his testator Burney, and effectual in law against each of said wards and his legal heirs, when he shall come to full age, see Thomp. Dig., 201, sec. 6. Knowing, or believing all this, it is not difficult to suppose he would come to a settlement with Hart, strongly disposed to procure from him receipts for money, signed severally as guardian for his several wards, if he could obtain them. That a receipt for the notes, to be held for the use of John Farmer's heirs, would not suit his purpose. But if it would, Hart could not give such receipt being guardian for but three of them.

Coming to this settlement under these impressions, he, Moseley, the plaintiff in this action, wrote the receipts himself—he stated the account current on the back of them himself. He took them severally for each of Hart's wards, for money expressed to be in part payment of the amount due from Burney as guardian—and Hart signed them as guardian of the wards in each case.

It is not possible to perceive what consideration was given Hart, to induce him to sign and deliver money receipts, to Moseley, executor of Burney, unless he and Moseley agreed to consider his notes due to Moseley, executor, as cash. And the account current (in the hand writing of Moseley,) on the back of the receipts, charging up these notes and the interest due on them, as part consideration

for the receipts, well sustains this idea.    This was at the suggestion of Moseley, he was prominent actor in shaping these receipts.— They are as he fixed them.    They were filed in the Clerk's office of the County, to protect Burney's estate *pro tanto* against Farmer's heirs; to operate as a credit in favor of Moseley, executor, in the settlement of his accounts with the estate of Burney, his testator.— It may be added, they served the purpose of shewing the amount of Hart's liability as guardian to his three wards severally.· No allegation is made of any surprise, mistake, or fraud, in obtaining these receipts—to the contrary, it was admitted all was fair and correct.    But it is objected to allow these receipts to operate is to allow Hart to make testimony for himself.    This is not perceived. The plaintiff offered them in testimony.    He wrote them—he obtained them—he uses them against Hart to discharge Burney's estate for so much—and for the additional purpose of crediting himself with their amount as executor, in his settlement with the estate. They shew that Hart received their amount in money, which binds him and his securities to his wards.    Moreover Hart is not a party to this suit, but Williams; and his, Hart's interest is equal both ways, if Williams is bound his, Hart's securities on his guardian bonds are not, if Williams is not bound they are.    But in either event Hart's estate is bound.    The evidence of Hart's liability to his wards as their guardian is found in his receipts to Moseley.— The evidence that Moseley parted with the notes and all interest in them to Hart is found in the account current on the back of them in Moseley's hand-writing.    He did not assign them in writing, but by delivery—he did not assign for the use of John Farmer's heirs; but if for their use then severally to three of them.    If he intended to deliver the notes to Hart to be kept as notes for the use of the three young Farmers why did he not take receipts to that effect? he could as easily have written such as those he did write.    Or why did he enquire into the solvency of Hart's securities on his guardian bonds, but with a view to convert Hart's notes given to Burney into cash.

There is every evidence it was the intention of Hart, and the understanding of Moseley at the time of making those receipts, that he, Hart, elected thereby to bind himself as guardian for the amounts specified in the receipts?    Indeed it is preposterous to suppose him bound as guardian for the amount of the receipts, and also bound for the proceeds of the notes.    But if Burney's estate can have

credit for the amount of the receipts, and this is not controverted, Hart and his sureties on his guardian bond are bound for the amount.

Moseley then delivered the notes sued on to Hart, the principal obligor in them, as and for payment for the receipts which Hart gave him. He considered them in that transaction, as Walker testified as so much cash, and that he parted with all claim and interest in them—and it must be they were considered as cash by both parties, or Moseley obtained receipts for money without paying it, and such a transaction would not be free from surprise, or mistake, or fraud.

Who is it that is at liberty to explain by extraneous proof a written receipt. This rule was manifestly intended to protect the maker against surprise, mistake, &c., in executing a receipt. But I apprehend no case will be found where the party protected by it or for whose use it was given has claimed the benefit of the rule especially when he wrote it himself. The receipts of Hart, made evidence by plaintiff, shew that Hart paid the notes sued on—and they were delivered to him. Other testimony of plaintiff shews that Hart while possessor, cut off the names of Chaires and Williams (the defendant,) who were his securities on these notes, as he did in other cases of his notes with sureties when he paid them—that this was done at the instance of Chaires in the case of these notes—and that the notes remained, and were in possession of Hart, at the time of his death.

How or on what consideration Moseley again became possessed of them is not shewn. Counsel seemed coy in approaching this inquiry. It is not pretended that Hart's administrator ever delivered them away. He thinks himself still the legal custodiary of them —and says in his testimony "they were taken from among Hart's papers by some person having no authority." These circumstances raise a violent presumption in this case, that Moseley is not now the rightful holder of the notes, and has no legal interest in them or right to sue on them.

It was incumbent on him to repel this presumption. The record furnishes no such proof.

It is said this suit was brought for the use of Farmer's heirs, that the equitable interest attaches in them in the notes, and they have the right to elect their remedy on the notes. It has been shewn that the equity as well as the legal right was in Burney in his life

time, by his election to charge himself as guardian with the' amount of the sale of land. It. has been shewn that this suit is not and cannot be for the use of Farmer's heirs.— The record shews that the three for whom Hart was guardian are yet minors. Their right of election is personal to themselves when they arrive at mature age, and cannot be delegated during their minority. It has been shewn that Moseley paid these notes to Hart the principal obligor for the receipts which he obtained, and extinguished all demand which he as executor had on them, unless he may be allowed to take the receipts as for money, use them for purposes valuable to himself and his testator as money ; and deny in this action having given money for them. It does seem equity, as well as law, would estop him from alleging anything to the prejudice of these receipts. An estoppel, says Lord Coke, "is where a man is concluded by his own act or acceptance to say the truth." Cited 2 Smith's L. C., 430. In this case Moseley, the executor, wrote the receipts, and induced Hart to consider his notes as money, and as payment for them. Hart signed them severally as guardian and Moseley accepted and used them as money receipts. Ought he now to be allowed to allege them to be anything else.

Mr. Justice Cowen in the case of Dezell vs. Odell, 3 Hill's Rep., 219, lays down an estoppel in pais to be "an admission intended to influence the conduct of the man with whom the party is dealing, and actually leading him into a line of conduct, which must be prejudicial to his interest unless the party estopped be cut off from the power of retraction."

Applying this rule which appears both lucid and just: Moseley to obtain money receipts from Hart the guardian considers his Hart's notes to Burney as cash, an admission tending and intended to influence Hart to give receipts to him for money ; by this admission of Moseley to Hart, he, Hart, is actually led into a line of conduct prejudicial to his interest unless Moseley be estopped the power to retract. He and his sureties on his guardian bonds are bound to his wards severally for the sums which by his receipts he acknowledges to have received. This retraction, if allowed, would bind him also to Burney's estate or to Farmer's heirs for the amount of the notes—which were the consideration in part for the receipts.

These receipts being then valid when given, and not alleged to have been executed by surprise, or mistake or fraud, but to have been fairly given and fairly received; and having been offered in

evidence in this case by the plaintiff Moseley, may be considered good evidence of such facts as they establish.   The prominent facts established by them are, That Hart acknowledged by them the receipt as guardian of the sums of money specified in them respectively, and thereby elected to charge himself in his liability as guardian with the amount; and second, in consideration of so charging himself as guardian the notes sued on were delivered to him by Moseley as paid and discharged.

This view is supported by the return of W. W. Hart as guardian of James, Argyle and Rufus Farmer.  He reports himself as having received of Wm. D. Moseley, Executor of A. Burney, dec.:

| In Cash, | 40 00 |
| In notes and accounts, | 3,463 00 |

And adds, "The above account as near correct as I can at this time make it, being very sick."   He then accounts for the hire of certain negroes amounting to $250.00.   And the Judge of the County Court enters thereon "I charge the guardian as per account stated above;" and after setting forth the items, again sums up and says $3,753.00.   Thus it will be seen the Judge on the return made by Hart, as guardian, charges him as such with the whole amount which he admits he had received.   The return was in amount obviously incorrect; but Hart says it was as near correct as he could make it, being very sick.   The proof shews he was sick in March, and died during the year; there is no date to his return.   It may therefore be as true as he could make it at the time when made.—— But right or wrong the Judge of the County Court considered it sufficient and proper evidence on which to charge him as guardian with the whole amount.

From the foregoing it is plain, that at the time of settlement between Hart and Moseley, Hart was debtor to Burney's estate, therefore to Moseley the representative of that estate, on sundry notes given by him to Burney, guardian of the heirs of John Farmer, dec.; and also that he was guardian of three of these heirs.   That in consideration of the delivery of these notes to him, and their supposed payment, (by both parties) he gave Moseley the money receipts in evidence in this suit, and bound himself and sureties on his guardian bonds for so much money ; does this not amount to an extinguishment of the notes due from him as a principal debtor, and by operation of the law of retainer, render him liable as guardian ?

It will be remembered these receipts shew the several sums which

he acknowledges to have received, as guardian, severally of his wards, and in addition to this evidence of election to hold as guardian. The County Court charges him, as guardian, with the whole amount he acknowledges to have received. The evidence in both ways is sufficient to fix his indebtedness in that character. He was the person to pay and the person to receive: by operation of law when this conjunction occurs, the money is regarded as *ipso facto* paid. Gray *vs.* Brown, 1 Richardson L. R., 337. Simpkins *vs.* Cable, 2 Bailey R., 60. Joyner *vs.* Cooper, same, 199, 202–3.

The case of Gray *vs.* Brown above cited, was an action against the surety on a guardian bond.

The Court held that when the right of receiving a fund as guardian, and the duty of paying it as trustee unite in the same person, the law presumes performance of the duty, and without further proof a surety of the guardian is liable. But the Court say when the right to receive and the duty to pay *absolutely concur* there can be no election. Whenever, by this *concurrence* or by *election*, the retainer is established, it is no answer for the surety of the character that has received by retainer to say, that the default occurred in the other character. In that case Carroll the principal held funds as *trustee* which he had been directed to re-invest but had failed to do so.— He was also *guardian* of his *cestui que* trust—and the question was whether the liability fell on his sureties, on his bond as *trustee*, or as guardian. The Court say, "If in the case before us it should be supposed, that under the bond taken by the commissioner of B. R. Carroll as trustee there was a right of action in the commissioner for the trustee's default to re-invest, or that said right of action was in the minors, suing by their next friend, it will be perceived that whatever sum may have been received in either form, would have belonged to the minors, and might have been made payable *to the guardian* whenever the order of the Court of equity should have been made for said payment. The case would have been just as it is now if judgment or decree for the amount of his default as trustee had been obtained against B. R. Carroll, and that the chancellor had directed his retainer as guardian." The Court further said, "Proof of the trustees inability to pay his debts could not prevent the presumption of retainer, for this debt may have been met, although others could not have been. Even entire destitution of means would not seem to arrest the presumption of payment, which by law results from the union of *debtor and creditor* in the same per-

son." The cases of Simkins vs. Cable, 2 Bailey, 60. McDowell vs. Caldwell, 2 McCord, 304. Joyner vs. Cooper, 2 Bailey, 199. Schneill vs. Schroeder, et al., Bail. Eq. Rep., 334. O'Neal vs. Hurbert, McMull.'s Equity Report 496, all seem (the Court say) to regard the extinguishment of the prior debt as a necessary legal result of this union. Gray vs. Brown, 1 Rich. R., 364.

- In Schneill vs. Schroeder et al., 1 Bail. Eq. Rep., 364, the Court held " a debt due by an administrator to his intestates estate is assets *in his hands ;* and if the administrator of an intestate becomes also the administrator of one of the distributees, his liability for the distributive share of the latter, in the estate of the former, attaches upon his *second administration.* And if he also become *guardian* of the sole distributee of his second intestate, his liability attaches upon him in the *latter* character, and for a default in paying over of funds in his hands, to which his ward is entitled as distributee of the *first* intestate, the sureties on his guardianship bond are *alone* responsible.

Jacob H. Boyer died intestate in 1817, leaving three children, Mrs. Schroeder, wife of John Schroeder, the defendant, Jacob F. Boyer, and Mrs. Wirtemburgh, who were the distributees of his estate. The defendant Shroeder took out letters of administration on the estate—and Schneill, the complainant, and one Harman Moore became sureties on his administration bond. Mrs. Wirtemburgh died subsequently leaving an only child, a daughter, who since intermarried with the defendant Marshburn. Shroeder also administered on the estate of Mrs. Wirtemburgh, and thereafter was appointed guardian of her child.

The bill in this case was filed by Schneill, one of the sureties on Schroeder's original administration bond, to enjoin proceedings at law, in an action brought against him on said bond, for the recovery of a sum alleged to be in the hands of his principal, Schroeder as administrator. And the Court held, upon the death of Mrs. Wirtemburgh, Schroeder, as her administrator, was himself *alone* entitled to receive her dividend of the estate of her father, Jacob H. Boyer. It was in his hands, and (the Court say) the condition of the bond was not only *legally,* but *literally* fulfilled. The whole object of the bond is to secure the payment of the proceeds of the estate to those who may be legally entitled to receive them. But the claim of Marshburn and wife upon the complainant are still one degree further removed. Schroeder was appointed guardian of

Mrs. Marshburne when she was an infant (supposed regularly and upon sufficient security) and the *necessary* consequence of this was that the amount in his hands, to which she was entitled as distributee of her mother became so much *held by him* in trust for her *as guardian*; and according to McDowell *vs.* Caldwell, 2 McCord. Ch. R., 55, the sureties to the guardianship bond are responsible for it. And the circumstances referred to constitute a complete bar to to the right of Marshburne and wife to recover at law. 1 Bail. Eq. R., 340.

In the case of Hall *vs.* Hall, 2 McCord., Ch. R. where it was shewn that the executors themselves owed considerable sums to the estate, the Court held the following language :—" The decided cases say, that these debts are so much *cash* in the hands of the executor ; and the Court will often order executors to pay the debts they owe, into the hands of the proper officer of the Court for the security of the parties interested, 2 Cox's Ca., 377 ; Eggleston and Coventry *vs.* Kingston, 8 Vesey, Jr., 466 ; Berry *vs.* Usher, 11 Ves., Jr., 87 ; Toller on Ex., 480 ; 6 Mass. R., 149 ; 11 do., 256.

A debt due by the executor of the estate of a testator, is assets upon the same plain reason upon which an executor, who is a creditor, may retain ; that he cannot *sue himself.* 13 Ves., Jr., 263 ; Hankey *vs.* Garrett, 3 Bro. C. C., 458 ; and it has been held a sufficient cause for the appointment of a receiver, Winthrop *vs.* Bass, 12 Mass. R., 199 ; Middleton *vs.* Dodwell, 13 Ves., Jr., 268–9. Thus the principle seems well settled, that where an executor or administrator having assets in his hands is also *guardian*, he can elect to hold the share of the legatee or distributee (his ward) in his character of guardian, and thus exonerate the sureties on the administration bond, and thus charge those on the guardian bond.

In the case of Joyner *vs.* Cooper, 2 Bailey's Equity Reports, one indebted by specialty to the estate of a lunatic, is appointed committee of his estate, and the specialty is transferred to and accepted by him as committee. The Court held the debt extinguished, and the sureties to his bond as commissioner are liable for so much received by him. So far as that case is applicable, it is as follows :

John McNish was by a decree of the Court of Equity directed to account with the commissioner for his actings and doings as commissioner of John Dupont, the lunatic. He was reported by the commissioner to be indebted to the estate of the Lunatic in the sum of $8,802 47-100, and the report was confirmed and made a decree

45

of the Court. In the amount reported was included the sum, principal, and interest, of a bond for 1,200, which McNish owed, and which was due to the estate of the lunatic before his appointment to be committee; after his appointment this bond was transferred to him by Thomas Dupont his predecessor in the office of committee and accepted by him. And it remained in the hands of his attorney uncancelled at the trial of the case. McNish being removed his successor instituted suit on his bond as committee and recovered judgment on it for the whole amount of the decree in equity. On this judgment among the questions raised one was: whether John McNish was properly charged as committee with the amount of *his own debt*, as so much money *received by virtue of his trust*.

Upon this point the presiding Judge delivering the opinion of the Court, says: "I regard the point as settled, that where one owes a debt to a trust, and afterwards assumes the management of the trust, the amount of *his debt* shall be considered as so much cash *in his hands*." Upon appeal the Court said, "This Court concurs in the opinion of the presiding Judge below, on all the questions he has discussed. The second ground, however, presents a question which although in effect decided by the judgment below, it may be necessary to decide expressly here. It cannot be denied that the committee of a lunatic is not subject to any further liability, if on the revocation of his powers he has accounted for and paid over the funds in his hands, to whomsoever may be legally entitled to receive them. Who in this case was entitled to receive from the former committee, Thomas Dupont, the funds in his hands? Unquestionably the committee, John McNish, who was appointed in his place. The commissioner of the Court had no right to receive them, unless specially authorized by the Court. McNish's appointment clothed him with all the power to receive and manage the estate of the lunatic. If he thought proper to settle with the former committee without even an account before the commissioner, he could do so, and his receipt for the funds was an act, to which he was fully competent. If he thought proper to receive *his own bond* there was nothing in the undertaking or duties of his trust to prevent his doing so; and the money due on the bond became thereby *a part of the trust fund*, and his sureties are answerable for it." See Joyner *vs.* Cooper, 2 Bail. Eq. R., 205.

The foregoing case seems analagous in principle and in every

essential feature, parallel with the case under consideration.

In the case of Galphin vs. McKinney, 1 McCord Ch. R., 298.—Nott, Justice, in delivering the opinion of the Court said, quoting from the Chancellor's opinion appealed from, " The order of the Court it is said, directing the delivery of the bond to McKinney as the executor of the estate of Galphin, was not intended to operate as a discharge of the debt, for there was no proof of payment made ; nor was it put to the Court, that in making that order it was intended to cancel the bond, and release the surety." The Justice in reply to these views of the Chancellor says : " With the most respectful deference for the opinion of the learned Chancellor, who delivered that decree, I cannot bring my mind to concur in that construction of the order delivering the bond to the obligor must of itself imply an intention to place it entirely at his disposal. What other intention can possibly be conceived ? It is said it was delivered to him as executor " eo nomine" for the benefit of the estate, and if he destroyed it he was guilty of a breach of trust. If it was delivered to him for the benefit of the estate, it was for the purpose of enabling him to appropriate the money due on it, to the payment of the debts and legacies of the estate. It was then giving the entire credit to the principal ; and the Court would violate its own rules, not to construe it into a release of the surety. The destruction of the bond was no breach of trust, because being in the hands of the obligor it became a dead letter. The misapplication of the fund might have been a breach of trust ; but the surety on the bond was not answerable for that. He was not security for the faithful administration of McKinney."

If the foregoing views have any force or propriety, and they are authoritative in South Carolina, where they have been acquiesced in and approved by the Courts, they seem to apply themselves to the case we are now discussing with peculiar fitness.

In the case of O'Neall vs. Herbert, Dud. Law and Equity Rep. Dec. Term, 1837, page 31–2, Chancellor Harper, delivering the opinion of the Court, said, " I suppose that if an administrator have in his hands the balance of an estate, and is afterwards appointed the guardian of an infant entitled to it, he will be chargeable as guardian, and the sureties on his guardianship bond will be liable, as in the case of Simkins vs. Cobb (2 Bailey R. 60) referred to by the Chancellor. So, if before his appointment he has received a sum of money as in McDowell vs. Caldwell (2 McCord's Ch. R., 55) or if in any

*other capacity* he be indebted to himself as guardian, being unable to sue himself, the debt shall be presumed to be paid, and he and his sureties will be liable.

In the case of Pratt et al. *vs.* Northom et al., 5 Mason R., 108, Mr. Justice Story says: If any act had been done by Ambrose by which *he elected* to pass the property to his guardianship account, or if he had charged himself with it, in the probate Court *as guardian,* there would be little difficulty in adopting the construction, that by operation of law it was instantaneously transferred to his account as guardian.

The real question in this part of the case, is, whether without any admission of Assets, or any admission of responsibility as guardian, a Court of Equity is bound to make that application for the party, which he has not made for himself; in this respect it differs materially from Taylor *vs.* Deblois. See 5 Mason R. 108.

In the case of Taylor *vs.* Deblois, 4 Mason R. 131, the Court said : " The principle of retainer is, where the party unites in himself by representation, or *otherwise* the character of debtor and creditor, inasmuch as he cannot sue himself, he is entitled to retain, and the law will presume a retainer in satisfaction of the debt, if there are assets in his hands." The learned judge further said, " I see no reason upon a review of the authorities, to doubt the accuracy of the statement ; and it is supported by Burdett *vs.* Pix, 1 Roll. Abr. Title Executors L. 3. C. 45. 2 Browlows, R. 50. Woodward *vs.* Lord Darcy, Plowden R. 184. Toller, C 3, Chap. 3. Same 109. 8 Serg't & R. 24, 30. 1 Pothier on Ob. 425.

In the case at bar, Hart did not owe money by representation, but admitting that Burney in his life time, and Moseley his representative, after his death, held these notes in trust for the use of Hart's wards, after that transfer, then he owed them *otherwise*, to wit, as principal ; and according to the doctrine in the last case cited, inasmuch as he could not sue himself, was entitled to retain, and the law will presume a retainer in satisfaction of his debts to them.— This case is very unlike the case of Pratt et al. *vs.* Northom et al. There the guardian admitted no assets either in that or any other character ; but it is plain from the case, had he admitted assets as guardian, Judge Story, who tried that cause would have charged him as such, and held all responsibility under his administration bond as *extinguished.* Here Hart receipts for the notes as cash, and signs the receipts *as guardian.* He accounts with the County Court

for what he had received *as guardian*, and is charged by the Court in *that character* with the amount. In this case then the duty to pay and receive both devolved on him, and the law presumes a retainer as guardian, and an extinguishment of the notes sued on. In this case, Hart elected to receive as guardian and account with the Court as guardian. And by his election a retainer of the funds as guardian, and an extinguishment of his notes as principal was worked, according to the authorities cited, "as a necessary legal result."— And he not only became chargeable as guardian for the amount so received, but to the extent of his return to the County Court, in fact was so charged.

Is Moseley bound to Hart's wards, the young Farmers, for the amount of these notes?—most obviously not, because the receipts he took of Hart the guardian, releases the estate he represents for that much; and are also good vouchers for him in his settlement of that estate.

That the mere loss or destruction of a note will discharge the liability of principal or surety, is a proposition which we apprehend will not be seriously urged by any one; we do not understand, however, that Williams the appellant, rests his defence on that ground.

But because the notes were delivered to Hart the principal as paid and released—or if not so, because by delivery to him as guardian the amount became chargeable against him and his sureties on his guardianship bonds—or because by delivery to him as guardian the right of action became suspended by operation of which his sureties, on the original notes (the subject of this suit) were discharged. It was suggested in argument on the part of the appellee Moseley, that these receipts of Hart, guardian, to Moseley, executor of Burney's estate, are receipts made by the debtor, and to allow them as evidence of extinguishment of the original notes, or of retainer as guardian, is to permit the party to make evidence for himself. It must be recollected these receipts were taken by, and delivered to Moseley the plaintiff in this suit below; it also appears by the testimony they are in his hand writing, and by the bill of exceptions, that they were put in evidence by him in the Circuit Court. It is too late to make the objection after he, Moseley, has used them and offered them in evidence below, to refuse to the appellant any benefit he may derive from them here. A party offering evidence is understood to waive all objection to its competency. Greenleaf *vs.* Birth, 5 Pet. R., 132-7-8. These receipts were received by Moseley,

executor of Burney, from Hart, guardian of three of Farmer's heirs; Moseley, the appelloe, wrote them; Hart, as guardian, signed them; Moseley offered them in evidence. Williams, the appellant, had nothing to do, as far as appears, with the making of them, or their custody, or any connexion with them whatever—why may he not avail himself of evidence thus thrown in his way? Their chief effect is to shew that Hart elected to charge himself with their amount as guardian of his wards; and this is evidence of the same kind usually referred to for that purpose: most of the cases before cited turn on such testimony—to which may be added the case of Alston *vs*. Munford, where the guardian · Munford was charged as such, (though he was testamentary guardian without security, and his securities as executor were discharged,) because he so charged himself on his own books, and to a bond debtor, whose debt had been bequeathed as a specific legacy to his ward, he wrote apprizing him of the fact. 1 Brock. R., 278. In the case of Taylor et al. *vs*. Deblois, et al., 4 Mason R., 135, the only evidence of transfer was a certificate given by Mrs. Deblois to the Probate Court that she (who was administratrix,) held the funds as guardian; this Judge Story held to be conclusive, and she became bound as guardian, and her securities as administratrix were discharged.

The weight of the objection that Hart received these notes, *eo nomine* for the use of Farmer's heirs, is not perceived. He did not receipt for them as notes; but for their amount, both principal and interest, as money. He did not receipt for them as guardian of Farmer's heirs; but separately as guardian of three of them, there being five. Moseley, the appellee, was an actor in making and receiving those receipts, they were moulded, as he thought best, to serve his interest. He surrendered the notes to Hart the principal obligor in them, as the consideration for the receipts and according to his own statements in evidence in the record, thought he was parting with all interest in them. By that act he suspended his right of action against Hart and his sureties on these notes for an indefinite period, that is during Hart's life time afterwards. This (if the doctrine of retainer did not apply) would be giving time to the principal in consideration of the receipts, without the privity or consent of the surety, and would in law discharge him. U. S. *vs*. Hillegan, 3 Wash: C. C., 70; Bank of Steubenville *vs*. Hogue, 6 Hamm., 17; Kennebec Bank *vs*. Tuckerman, 5 Greenl., 130; Bank *vs*. Woodward, 5 New H., 99. The delivery of a note, bill, or execution, with

intent to *transfer the debt* upon a *fair* bargain, and for a *valuable* consideration, is a sufficient assignment. Titcomb *vs.* Thomas, 5 Greenl., 282; Clark *vs.* Rogers, 2 do., 147; Jones *vs.* Witter, 13 Mass., 304; Dunn *vs.* Schnell, 15 do., 485. And so held of other choses in action. Briggs *vs.* Dorr, 19 John., 95; Prescott *vs.* Hall, 17 do., 284; Vose *vs.* Handy, 2 Greenl., 322; Robbins *vs.* Bacon, 3 do., 349; Onion *vs.* Paul, 1 Har. & John., 114. These and numerous other authorities sustain and make valid the transfer by Moseley to Hart of the notes sued on.

It is said in argument, these notes were not extinguished, but the right of action was suspended during the lifetime of Hart, the guardian, and again revived at his death. It will be remembered the only legal holders of these notes were Burney in his life time; Moseley, his executor, after his death, and Hart, the guardian, by transfer, by delivery, from Moseley for a valuable consideration.— So that any time after the notes were five years past due, the statute of limitations would have been a valid as well as meritorious plea, for the appellant Williams, who is only a surety. The accident of the death of Hart is the fact on which the law of the case is therefore made to depend. Had Hart lived until these notes, or any of them, were five years past due—after that, a plea of the statute of limitations, would have been a bar to a suit brought against Williams the surety, on all of them so conditioned. For during Hart's life, Moseley, the appellee, had no right of action against the surety Williams, he having parted with all interest in the notes. It seems therefore the right of Moseley to maintain this action does not depend upon any legal title which he has in, or to the notes sued on; but upon the death of Hart, to whom he had transferred them, and all interest in them for a full and valuable consideration.

The Court being equally divided in opinion the judgment of the Circuit Court will stand. But I for the reasons herein stated, think that W. D. Moseley, the appellee, in this Court, and plaintiff in the Court below, has not shown a legal ground of action against Robert W. Williams, the appellant here, and defendant in the Circuit Court, and that the judgment of that Court ought to be reversed.

Upon the question of holding adjourned terms of the Circuit Court raised by the exceptions in the record of this cause, the 3d section of the act of 1828 to regulate judicial proceedings, Duval L., 90,

R. W. Williams, Appellant, *vs.* W. D. Moseley for the use of P. Smith, Appellee:

provides "when any Judge shall not attend on the first day of the term, the Court shall stand adjourned until twelve o'clock on the second day, and if said Judge shall not then attend, it shall be the duty of the Clerk at that time to continue all causes and adjourn the Court to such time as the judge may appoint, or until the next regular term by law established." Justice Lancaster, and Chief Justice Douglas, are of opinion that the Judges have power under this section to adjourn the term of the Circuit Court at the time, and under the circumstances provided in the section above mentioned (to hold adjourned terms of the Court) at any time not to interfere with the regular term of any other Court in the Circuit, but that their powers to adjourn terms under other circumstances, seem not to be created by statute ; therefore, no opinion is given on that point.

HAWKINS, J., for Affirmance.

DOUGLAS, C. J., for Reversal.